**Deborah SCOTT, Plaintiff,**

v.

**SULZER CARBOMEDICS, INC., Mark Hamlet and Robert White, Defendants.**

**No. C.A. 98–10711–NG.**

United States District Court, D. Massachusetts.

May 15, 2001.

As Amended June 21, 2001.

Matthew Cobb, Law Firm of Matthew Cobb, Boston, MA, for Deborah Scott, Plaintiff.

Lisa J. Damon, Brigitte M. Duffy, Seyfarth Shaw, Boston, MA, for Sulzer Carbomedics, Inc., Robert White, Mark Hamlet, Defendants.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

The plaintiff, Deborah Scott ("Scott"), brings this action against the defendants, Sulzer Carbomedics, Inc. ("Sulzer"), Mark Hamlet ("Hamlet"), and Robert White ("White") alleging discrimination on a variety of grounds.[1] The core claim involves disparate treatment and mixed-motive discrimination under Title VII of the Civil Rights Act of 1964, the Equal Pay Act, and analogous state legislation.

At their inception, these statutes comprised broad remedial legislation, and the earlier case law emphasized the importance of their progressive goals. *E.g. Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), (the primary prophylactic objective of Title VII is "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of [certain] employees over other employees"); *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (7th Cir.1971) ("In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes").

But, as the number of federal discrimination claims have multiplied, judicial decisions appear to reflect more concern for "disgruntled employees" seeking wrongfully to exploit federal resources than for broad social and legal reform. *See, e.g. Bray v. Marriott Hotels,* 110 F.3d 986, 1002 (3rd Cir.1997) (Alito, J., dissenting) (anti-discrimination law was not designed to allow "disgruntled employees" to impose the costs of trial on employers who, although they have not acted with the intent to discriminate, may have treated their employees unfairly); *Visser v. Packer Engineering Associates,* 924 F.2d 655, 659 (7th Cir.1991) (discrimination law would be "unmanageable if disgruntled employees" could defeat summary judgment by affidavits simply speculating about a defendant's motives). As a result, an elaborate law of summary judgment has evolved purportedly to separate the meritorious from the frivolous claim. Yet some courts may well have gone too far, fashioning rigid rules to deal with what is a complex and often nuanced reality[2] and granting summary

---

1. Those grounds are: 1) that Sulzer discriminated against her on the basis of her gender in violation of Mass.G.L. c. 151B ("c.151B") (Count I) and in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e ("Title VII") (Count V); 2) that Sulzer violated the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA") (Count IV); 3) that Hamlet and White intentionally interfered with Scott's employment contract with Sulzer (Count II); and, 4) that Sulzer, Hamlet, and White libeled and slandered Scott both during and after her employment with Sulzer (Count III).

2. The ultimate question of fact in discrimination cases—an actor's state of mind—is a highly nebulous concept and thus, most difficult to resolve on summary judgment. *See Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991) (in employment discrimination

judgment to defendants in the vast majority of federal employment discrimination cases—even where substantial issues may predominate over contrived ones.

These concerns lead me to scrutinize this action: where the defendants move for summary judgment on the ground that the discrimination complaint is a cover for a "disgruntled employee" seeking to redress workplace grievances unrelated to gender,[3] and the plaintiff counters that she has produced enough evidence to justify a trial on her discrimination claims. After reviewing all of the submissions in this case, I must conclude that the facts—as they have been developed by plaintiff's counsel[4] —do not meet any of the relevant tests to defeat the defendants' motion for summary judgment.

The story that emerges from the documents is not one of discrimination, but one of performance, of administrative deficiencies and inadequate sales, of careless inventory management and delinquent expense reporting. Scott might well have sought to contextualize her inadequacies, claiming, for example, that male workers who had similarly problematic records were treated better or that she was sub-

jected to higher levels of scrutiny. Instead, beyond her conclusory allegations and unsupported second-hand accounts, she offers no objective comparative data to support such a claim. She points only to a series of remarks made by one decision-maker on one occasion about her hair and appearance—comments that may be a cue to a stereotyped view of women and their role in the workplace. However, the particular context in which those remarks were made suggest not even a tangential connection to the negative performance evaluations that predate them nor the adverse employment decisions that surround them. Rather, opinions of Scott's work performance are corroborated by an extensive record, developed both long before and long after these isolated comments were made.

Accordingly, for the reasons elaborated in greater detail below, the defendants' Motion for Summary Judgment [docket entry # 29] is **GRANTED**.

## I. FACTS

### A. Scott's Hiring

Sulzer, a manufacturer of prosthetic heart valves, hired Scott in January of

---

cases, "where an [employer's] intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate"); *see also Poller v. Columbia Broad. Sys.,* 368 U.S. 464, 470, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (summary judgment procedures should be used "sparingly" where the issues of motive and intent play "leading roles"); *Dominguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 433 (1st Cir.2000) (determinations of discriminatory intent are questions better suited for a jury).

**3.** Specifically: (1) Portions of Scott's claims under c. 151B and Title VII are time-barred; (2) Scott's surviving claims under c. 151B and Title VII fail to establish a prima facie case of discrimination or demonstrate that the legitimate non-discriminatory reasons proffered by the defendants are pretextual; (3) Scott's EPA

claim fails to establish that she performed the same work as individuals with whom she compares herself or that disparities in pay, to the extent that they may exist, derive not from gender-based motivations; (4) Scott fails to support her claim of tortious interference with contract with a demonstration of the defendants' improper motive; and, (5) Scott fails to support her libel and slander claims with evidence that complies with Fed.R.Civ.P. 56(e) or overcomes the defendants' conditional privilege.

**4.** This case was originally closed on October 5, 2000, when plaintiff's counsel, after receiving five extensions by this Court, failed to meet the deadline to file an opposition. The case was reopened on the condition that the plaintiff meet a final deadline for reply.

1994 as a District Sales Manager ("DSM") to sell its products to hospitals throughout the United States. Eight other individuals were hired as DSMs over the course of 1994.[5] All DSMs reported directly to Mark Hamlet, who was responsible for overseeing the performance of Sulzer's entire sales force.

Scott was hired specifically as Sulzer's DSM for the New England Region, Territory 1110, which included New Hampshire, Maine, Vermont, Massachusetts, Rhode Island, Connecticut, and upstate New York. In addition to her sales duties, Scott's administrative responsibilities included territory budgeting and expense control, inventory management, accounts receivable collection, support in meeting regulatory requirements, participation in company and customer meetings, and maintaining timely, accurate, and complete activity reports.[6]

As part of her compensation, Scott was offered a package that included a $50,000 base salary, a guaranteed target commission of $40,000 (pro-rated from starting date), and a $450 monthly car allowance.

Around the commencement of her employment, Scott received and signed for the Sulzer Employee Handbook ("the Handbook"). In signing the Handbook Receipt and Acknowledgment form, Scott acknowledged that she understood the nature of her employment to be at will and, hence, terminable by Sulzer or Scott at any time.[7] Sulzer's at-will employment policy is reiterated many times in the text of the Handbook.[8]

The Handbook also contains a "progressive discipline policy," which provides that a supervisor may take one or more of the following steps in addressing an employee's performance or conduct: investigation, counseling, verbal warning, written warning, suspension, or discharge.[9]

### B. Scott's Performance

#### 1. 1994—Spring 1996

Scott's performance was problematic from the outset. For the 1994 fiscal year, she sold sixty-two valves, or 30.3% of her targeted sales figures of 200 valves. Among DSMs, she ranked fourth of ten in both number of sales and percent of sales target. She achieved sales in only six of thirty-three hospitals in her target territory, and the bulk of her successful sales (forty-two/sixty-two) occurred at one, the Beth Israel Deaconess hospital in Boston, the site of Sulzer's clinical transplant trials.[10]

Significantly, during the course of Sulzer's 1994 inventory audit, Scott was un-

---

5. The eight newly hired DSMs were: White, John Colaizzi ("Colaizzi"), Tom Dwyer ("Dwyer"), Norge Mastrangelo ("Mastrangelo"), Michael Pope ("Pope"), Steven Korte ("Korte"), John Zehren ("Zehren"), and David Martin ("Martin"). Gary Holdren ("Holdren") and David Bye ("Bye") already held the position of DSM when Scott arrived.

6. *See* 1994 Commission Program for Deborah Scott, attached as Defendants' Exhibit 10 [hereinafter "Def. Exh."].

7. *See* Handbook Receipt and Acknowledgment, Def. Exh. 11.

8. *See* Handbook, pp. 3, 30, Def. Exh. 12.

9. *Id.* at 29–30. The Handbook delineates Sulzer's sexual harassment policy, including the procedures by which employees lodge and supervisors handle complaints. *Id.* at 19–20.

10. *See* Def. Exh. 15. This is significant because hospitals conducting clinical trials with Sulzer heart valves are more likely to continue purchasing the company's valves in the future. *See* June 13, 2000 Deposition of Hamlet [hereinafter "Hamlet Depos."], Vol. II, p. 20, Def. Exh. 2.

able to account for three valves.[11] Defendants estimate that mislaid valves were written off at a cost of more than $3,000 per valve and potentially jeopardized Sulzer's FDA-mandated compliance requirements.[12]

Scott's work performance for 1994 was first reviewed formally in February, 1995, by her then supervisor Russ McDaniell ("McDaniell"). In his Exempt Employee Performance Summary for Scott, McDaniell rated her performance as "Good/Needs Improvement," noting that Scott was deficient in three areas: her lack of maturity in handling corporate policy, her lack of poise in front of surgeons and company personnel, and her lack of care and promptness in expense reporting.[13]

In June of 1995, Patrick Kothe, Director of Sales Administration and of Marketing, sent Scott a memorandum concerning her excessive requests for the reimbursement of business expenses. Kothe speculated that Scott's targeted annual expenditures for promotional goods, including pen and pencil sets, golf and tennis balls, and Swiss Army knives, would exceed $20,000—this in addition to other expenses routinely incurred by DSMs in soliciting and entertaining Sulzer clients.[14] By Kothe's estimation, no other DSM ever submitted requests approaching this magnitude.[15]

Six days later, Lisa Standley ("Standley"), Director, General Accounting at Sulzer, sent Scott a memorandum in which she advised Scott that her privilege to have expenses reimbursed on the basis of faxed expense reports was being revoked due to Scott's consistent failure to comply with Sulzer protocol. Sulzer protocol required the prompt submission of expense reports in hard copy and with supporting documentation.[16] According to Standley, Scott was the only DSM between 1994 and 1997 "who was so consistently late in submitting her original expense form and receipts that the privilege to [sic] paid based upon the faxed form was revoked."[17]

In November of 1995, Kothe advised Scott of her continued failure to comply with Sulzer's consignment audit requirements. Specifically, Kothe advised Scott that, three weeks after the audit was due, she had completed only four of eleven sites.[18] Approximately one month later, Scott disclosed that she had lost one of her valves when Sulzer products had allegedly been stolen from the trunk of her car.[19] Kothe, believing that no other DSM had

---

**11.** See January 4, 1995 Fax Transmittal from Debra Dagel ("Dagel"), Customer Service Coordinator, Def. Exh. 16.

**12.** See August 9, 2000 Affidavit of Patrick Kothe ("Kothe"), Director of Sales Administration and Director of Marketing, (hereinafter "Kothe Aff."), ¶¶ 5–7, Def. Exh. 13. Defendants contend that unaccounted for valves have significant safety implications in the event that a product is deemed hazardous and recalled.

**13.** See Def. Exh. 17.

**14.** See June 13, 1995 Memorandum from Kothe, Def. Exh. 18.

**15.** See Kothe Aff. at ¶ 16, Def. Exh. 13.

**16.** See June 19, 1995, Memorandum from Standley, Def. Exh. 21.

**17.** See August 9, 2000 Affidavit of Standley [hereinafter "Standley Aff."] ¶ 6, Def. Exh. 20. Standley contends that the tardy submission of expense reports impacts on the company's financial success in terms of their ability to calculate accurately profitability and anticipate upcoming costs. Id., ¶¶ 12–14.

**18.** See November 9, 1995 Memorandum from Patrick Kothe, Def. Exh. 23.

**19.** See December 11, 1995 Memorandum from Donna Robinson ("Robinson"), Manager, Sales Administration, with Scott's handwritten response, Def. Exh. 24.

ever lost valves from their inventory,[20] advised Scott that the value of any subsequently lost valves would be deducted from her sales commission.[21] Donna Robinson, Manager of Sales Administration, followed up Kothe's memorandum with one of her own, reprimanding Scott for inaccurate record-keeping and careless inventory management.[22]

By the end of 1995, Scott had a mixed sales record. She sold 151 of a unit target 200 valves, which totaled an improved 76.7% of her sales target. In "percent of sales target," however, Scott ranked but seventh of ten among all DSMs and fifth out of the six original DSMs. Furthermore, in total number of valves sold, Scott ranked sixth of ten. In terms of her overall territory, Scott made sales only to fourteen of thirty-three hospitals.[23]

To be sure, Scott did make a significant contribution to Sulzer, in 1995, by establishing a connection between Sulzer and Brazilian cardiac surgeon Rondas Batista ("Batista"). Batista had used a Sulzer heart valve in a controversial surgery that generated publicity for Batista and Sulzer. Scott was instrumental in establishing and maintaining Sulzer's relationship with Batista (hereinafter "the Batista Program").[24]

Furthermore, in January of 1996, Scott was awarded a "Ranger of the Year" award based on her performance in handling a crisis at a Buffalo Hospital.[25]

In February of 1996, her supervisor, McDaniell completed a Performance Summary for the 1995 fiscal year. Though commending Scott for attending a conference in Brazil to secure clients and for being innovative in setting up surgeon conferences, McDaniell noted further that Scott failed to adhere to her sales budget and needed to improve the timeliness of her expense reporting, her organizational skills with regards to inventory management and communication with home office personnel, her poise in front of company personnel, and her willingness to take constructive criticism and direction. Overall, her performance was rated "Good" and "Needs improvement."[26]

Shortly thereafter, McDaniell sent to Scott a memorandum in which he addressed Scott's practice of submitting incomplete and tardy expense reports. McDaniell attached an expense report submitted by Scott seeking reimbursement for a dinner that cost almost $1,900; the report did not include the names or number of all the individuals present at the dinner.[27]

---

20. *See* Kothe Aff. at ¶ 12, Def. Exh. 13.

21. *See* January 8, 1996 Memorandum from Kothe, Def. Exh. 28.

22. *See* January 10, 1996 Memorandum from Robinson, Def. Exh. 29. Robinson reminded Scott of her "difficulties in the management of [her] consignment inventory" and advised her that significant resources might be conserved if Scott were to keep "meticulous records, and [provide] timely and accurate information." *Id.*

23. *See* Def. Exh. 14, 26, 27; Kothe Aff. at ¶¶ 20–21, Def. Exh. 13.

24. *See* May 12, 1996 Memorandum of Hamlet, p. 1296, Plaintiff's Exhibit 26 [hereinafter "Pl. Exh."], where Hamlet reports of "doors

[being] opened" as a result of Scott's relationship with Batista; June 3, 1996 Memorandum of Hamlet, p. 905, Pl. Exh. 26, where Hamlet states that Scott arranged a "coup" in which all six New England states were represented at a Sulzer gathering featuring Batista as a presenter.

25. *See* Pl. Exh. 14, at SC1585–1586. At least four other employees received this award. *See id.*

26. *See* February 20, 1996 Exempt Employee Performance Summary, Def. Exh. 32.

27. *See* March 15, 1996 Memorandum from McDaniell, Def. Exh. 33.

## 2. *July 1996 Visit by Hamlet*

In the Spring of 1996, Sulzer reorganized its organization in the wake of a resignation by McDaniell, splitting the country into three regions each to be headed by a Regional Sales Manager ("RSM") to whom DSMs in the region were to report. Rob White, promoted to the position of Eastern Regional Manager, became Scott's direct supervisor.[28]

In order to ensure a successful transition to her new supervisor and to appraise her performance in light of concerns previously registered by McDaniell, Kothe, Standley, and Robinson, Hamlet paid a visit to Scott for a week in July of 1996.[29]

Scott contends that during the course of Hamlet's week-long visit to Boston in July of 1996, he made a number of disparaging remarks that evidenced his gender bias. Specifically, Scott alleges that as she was dialing a phone number, Hamlet commented that she should cut her fingernails because they were too long. Scott alleges further that, prior to a sales presentation, Hamlet informed Scott that she wore too much makeup.[30] Hamlet admits that he may indeed have made these statements.[31] On another occasion, Scott alleges that Hamlet evidenced his gender-bias by attempting to play a paternal role with Scott when he likened her to his child.[32]

Nevertheless, Scott concedes that she does not recall any other occasions where Hamlet made such comments.[33] Nor does Scott suggest how Hamlet, prior to his visit, might have influenced the negative evaluations she had received from other supervisors who themselves never made any such comments.

Hamlet followed up his visit to Scott with a "coaching letter," in which he both acknowledged Scott's strengths (including her work ethic, personal integrity, sincerity, toughness, and competitiveness) and critiqued her overall performance (including her lack of punctuality, her degree of disorganization, her expense mismanagement, her lack of teamwork, her lack of self-control, and her overall lack of professionalism).[34] Hamlet advised Scott that, absent marked improvement, her performance deficiencies were grounds alone for dismissal from Sulzer. Scott is alleged to have expressed her dissatisfaction with the letter by hurling a string of invectives about Hamlet to her supervisor, White.[35]

## 3. *1996—May 1997*

In late 1996, Scott made slight improvements in her performance. Indeed, in his first Performance Summary of Scott, White rated her overall performance as "Good," noting that Scott had improved handling her administrative responsibilities and commending Scott's sales ability

---

28. *See* Hamlet Depos., Vol. III, 19–22, 34–35, Def. Exh. 2.

29. *Id.* at 33–35; September 28, 2000 Affidavit of Scott [hereinafter "Scott Aff."], ¶ 15, Pl. Exh. 15.

30. *See* Scott Aff, ¶ 35, Pl. Exh. 15.

31. Hamlet Depos., Vol. III, pp. 43–45, Def. Exh. 2.

32. *See* April 11, 1996 Memorandum from Hamlet, Pl. Exh. 12; Scott Aff, ¶ 11, Pl. Exh. 15.

33. *See* October 5, 1999 Deposition of Scott [hereinafter "Scott Depos."], Vol. II, 126–128, Def. Exh. 7.

34. *See* July 31, 1996 Memorandum from Hamlet, Def. Exh. 35.

35. *See* April 25, 2000 Deposition of White [hereinafter "White Depos."], p. 80, Def. Exh. 22.

and "potential" to become one of the best performers on the sales team.[36] Furthermore, White sent a series of encouraging e-mails to Scott, complementing her performance, her improved punctuality, and her efforts to increase sales.[37] Hamlet, notwithstanding his supposedly sexist remarks several months before, joined White in these laudatory e-mails.

However, by late November of 1996, Scott's performance had again deteriorated by the objective measures of the company. Her sales declined significantly in October and November, with actual sales trailing projected sales by more than 50%. In his monthly report for November of 1996, White concluded that Scott's Boston territory faced "considerable adversity" and needed "close" supervision.[38] White then sent Scott a letter addressing several areas of potential improvement, including her lack of accessibility by phone or pager, her inability to accept constructive criticism, the excessive degree of her business expenses, and the tardiness of her expense report filing and responses to auditing requests.[39]

Furthermore, despite her having made improvements late in the year, Scott's overall sales record for 1996, and comparative standings, did not change dramatically from her record in 1995. Scott sold 212 out of 250 units, achieving an improved 89.6% of her sales target. However, she ranked but seventh out of all sixteen DSMs and fourth out of the six original DSMs.[40] Moreover, making sales in only thirteen of the thirty-three hospitals in her region, Scott sold the majority of her valves (118 of 212) at one hospital, Beth Israel Deaconess Hospital in Boston.

In January of 1997, White again evaluated Scott's performance, continuing to critique her for sales below forecast, excessive expenses, and tardy reports. Overall, White rated Scott's performance as "Needs Improvement" and her administrative management as "Unacceptable."[41] This report followed an email in which White informed Scott that she was the only one in the region who had failed to submit a territory update, though her submissions were overdue by a month.[42]

Recognizing that the geographic breadth of the New England Territory contributed to declining sales, Sulzer split Scott's territory in 1997 and hired Darren Lambroff ("Lambroff") to fill the DSM position in the proposed additional New England territory.[43] Scott's condensed territory contained hospitals at which she achieved the bulk of her sales the previous year, which should have made it easier for Scott to meet her sales goals.[44]

36. *See* August 30, 1996 Exempt Employee Performance Summary, Def. Exh. 40.

37. *See* Def. Exh. 41.

38. *See* Def. Exh. 43 and 44.

39. November 25, 1996 letter from White, Def. Exh. 42.

40. *See* Sales Performance Table, Def. Exh. 14; Kothe Aff. at ¶ 22, Def. Exh. 13.

41. *See* January 26, 1997 Exempt Employee Performance Summary, Def. Exh. 46. White noted specifically that Scott submitted six

weeks of expense reports at year-end totaling approximately $21,000. Furthermore, he emphasized that, given Scott's tenure as a DSM at Sulzer, she would be given no "grace period" to improve her careless administrative responsiveness.

42. *See* Def. Exh. 47.

43. *See* White Depos., pp. 93–94, Def. Exh. 22; New England Territory Realignment Plan, Def. Exh. 48.

44. *See* August 4, 2000 Affidavit of Hamlet [hereinafter "Hamlet Aff."], ¶ 12–13, Def. Exh. 1.

Instead, Sulzer contends that Scott's performance continued to suffer, particularly in terms of the timeliness, preparation, and diligence of her expense reports. From November 1996 until May 1997, close to half of her expense reports were submitted more than four weeks after they were due.[45] During this same period, no other DSM approached Scott's degree of tardiness in reporting, as over 95% of all expense reports were submitted by other DSMs within two weeks of reporting deadlines.[46] Furthermore, in late April of 1997, White informed Scott via email of his concern over the fact that Scott had achieved only 19% of her monthly sales quota with only one week remaining in the month of April.[47]

### 4. *The Decision to Terminate*

In May 1997, White approached Rose Ramon ("Ramon"), Vice President of Human Resources at Sulzer, about terminating Scott's employment. White later circulated a memorandum to Ramon and Hamlet, citing Scott's inadequate sales performance given her tenure, her administrative deficiencies, her lack of team support, and her overall hostile attitude and resistance to constructive criticism.[48] A joint decision was made among Scott's supervisors, and, on June 10, 1997, Ramon and White met with Scott in Boston to advise her that her employment was being terminated.[49]

45. Standley Aff. ¶ 10, Def. Exh. 20.

46. *Id.*

47. April 21, 1997 email from White, Def. Exh. 52.

48. May 22, 1997 Memorandum to Ramon and Hamlet, Def. Exh. 53.

### C. *The Alleged Gender Discrimination*

### 1. *Direct Evidence of Discrimination*

Scott points to Hamlet's comments during his week-long visit to Boston in July of 1996 as direct evidence of his gender bias. Even if Hamlet had made those remarks, which I am obliged to assume, Hamlet was not the sole decisionmaker here. In fact, problems with Scott's performance were noted by a number of company officials, apart from, and in many cases, apparently independent of, Hamlet.

### 2. *Circumstantial evidence of Discrimination*

Scott implies that there is circumstantial evidence of gender bias in the company's various employment decisions:

### a. *Promotion Decisions*

Scott claims that Sulzer routinely promoted similarly situated or lesser qualified males in her stead.[50] In particular, in July of 1996, Sulzer promoted Dwyer and Colaizzi to the newly created position of Senior District Sales Managers ("SDSMs"), and in June of 1996, promoted White, Holdren, and Troy Phelps ("Phelps"), to the newly created positions of Regional Sales Managers ("RSMs").[51] Scott contends that the decision not to promote her, despite her comparable sales figures and significant accomplishments with the Batista Program, derived from the gender animus of her supervisors.

49. March 24, 2000 Deposition of Ramon [hereinafter "Ramon Depos."], p. 54, Def. Exh. 8; White Depos. at 23–25, 52–53, Def. Exh. 22.

50. Duggan was hired by Sulzer to replace Scott. White Depos., pp. 16–17, Def. Exh. 22.

51. *See* Ramon Depos., pp. 34–35, 37–39, Def. Exh. 8.

Defendants answer that Dwyer and Colaizzi were promoted to the position of Senior District Sales Manager[52] and White, Holdren, and Troy Phelps to the position of Regional Sales Manager because of sales performance, field experience, and administrative capabilities superior to Scott.[53]

### b. *Compensation Decisions*

Scott argues further that Sulzer compensated similarly situated male DSMs more substantially, paying male DSMs approximately $150,000 in annual salary to Scott's $113,000 for equivalent work. Additionally, Lambroff and Ed Duggan ("Duggan") each received higher first-year guarantees in combined base salary and commission in 1997 than Scott received in her first year of employment in 1994.[54] Finally, Scott alleges that a male DSM, Kurt Gibbe ("Gibbe"), started his employment at Grade Level 550, while throughout her tenure at Sulzer, Scott remained at the lower-compensated Grade Level 450 despite her having outperformed Gibbe.[55]

Defendants contend that discrepancies in performance and experience alone account for discrepancies in compensation. DSMs are paid both a base salary and commission. The starting salary for each DSM is determined on the basis of such factors as prior work experience, education, and prior compensation rates. As for commission, Sulzer guarantees at a minimum a target commission for each DSM during the first year of employment, though DSMs may earn more than the guaranteed base if they exceed predetermined targets.[56]

During her Sulzer tenure, Scott was compensated as follows: In 1994, her base salary ($50,000) and guaranteed commission equaled $90,000; in 1995, her base salary ($51,252) and guaranteed commission equaled $87,827; in 1996, her base salary ($55,952) and guaranteed commission equaled $110,421; and, in 1997, her base salary ($57,075) and guaranteed commission equaled $146,358.20.

By comparison, Scott's total compensation for 1994 exceeded that of three male DSMs and was virtually identical to the total compensation received by DSMs

---

**52.** In addition to the ordinary responsibilities of a DSM, SDSMs supervise the training of sales personnel, sales meetings, clinical trial activities, and emergency sales coverage. *See* March 24, 2000 30(b)(6) Deposition (hereinafter "30(b)(6) Depos."), pp. 13–14, Def. Exh. 5.

**53.** In 1995 and 1996, Dwyer's sales performance exceeded Scott's in both numbers of units sold and percent of sale target. *See* Def. Exh. 14. Furthermore, he had no reported deficiencies in fulfilling his administrative duties and allegedly displayed good teamwork in interacting with other departments like marketing and customer service. *See* February 1, 1995 and February 20, 1996 Exempt Employee Performance Summaries for Dwyer, Def. Exh. 55 & 56; Hamlet Depos., Vol. III, p. 16, Def. Exh. 2. Likewise, Colaizzi exceeded Scott in percent of sales target in 1995 and number of sales in 1995 and 1996 and had no reported deficiencies in fulfilling

his administrative duties. *See* Def. Exh. 14; February 1, 1995 and February 20, 1996 Exempt Employee Performance Summaries for Colaizzi, Def. Exh. 57 & 58; Hamlet Depos., Vol. III, p. 18, Def. Exh. 2.

White and Holdren exceeded Scott in units sold, actual sales, and percent of sales target in 1994, 1995, and 1996. *See* Def. Exh. 14. Furthermore, having been employed since 1991, Holdren was Sulzer's most tenured salesperson. *See* Hamlet Depos., Vol. III, pp. 19–21, Def. Exh.2. As for Phelps, he, like Holdren, had managerial experience in his previous jobs and a sound administrative record. *See id.*

**54.** *See* Scott Depos., Vol. II, 136–139, Def. Exh. 7.

**55.** *See* Plaintiff's Statement of Facts, ¶¶ 1, 19.

**56.** *See* 30(b)(6) Depos., p. 53, Def. Exh. 5.

hired with Scott in 1994.[57] In fact, Scott's base salary equaled or exceeded the base salary of all male DSMs hired in 1994. In addition, in 1995, eight DSMs made less base salary than Scott, and the three DSMs who exceeded Scott in base salary compensation for 1995—Colaizzi, Holdren, and Mastrangelo—each received higher overall performance ratings than Scott. Similarly, in 1996, Scott's base salary trailed only those DSMs who had received higher performance ratings of "Commendable" or "Good" as compared to Scott's evaluation of "Good/Needs Improvement." Likewise, in 1997, Scott trailed only three DSMs in base salary, two of whom were new hires with salaries that reflected greater market demand, and one of whom whose performance exceeded Scott's.[58]

As far as discrepancies between the first-year guarantees received by Lambroff and Duggan in 1997 and those received by Scott in 1994, defendants cite a number of factors unrelated to gender that mandated their higher salaries, including Sulzer's changing position in the valve industry, higher competition for qualified employees, and higher compensation offered by competitors in the industry. Importantly, all DSMs hired after Scott—both male and female—received combined compensation packages that exceeded Scott's starting package in 1994.[59]

With regards to Scott's claim that Kurt Gibbe started his employment at Grade Level 550 despite having been outperformed by Scott, a subordinate Grade Level 450 employee throughout her tenure, defendants have demonstrated that it was a clerical error for Gibbe to have been initially classified at the Grade 550 level reserved for Senior DSMs. Indeed, Gibbe never received a higher base-salary than Scott as a result of Sulzer's miscoding.[60]

#### c. *Miscellaneous Decisions*

Scott contends that the defendants discriminated against her on the basis of gender when they chose to divide only Scott's sales territory, "singled out" Scott for false criticisms regarding deficient expense reports, downplayed her accomplishments with regard to the continued success of the Batista Program, forced her and no male DSM to attend a basic sales training course at Sulzer's Texas facility in the Fall of 1996, and disparaged her performance to potential employers, headhunters, and customer contacts, post-termination.[61]

Defendants dispute that Scott was "singled out" for impermissible reasons. To begin with, Sulzer frequently modified the contours of other sales territories.[62] Furthermore, Sulzer sent Tom Dwyer to accompany Scott to Texas in 1996 with the purpose of having *both* assist in training of others and simultaneously reinforce their sales skills.[63] Finally, defendants claim

---

**57.** Scott's total compensation did not trail any male DSM by more than $280, an insignificant figure in relative terms.

**58.** *See* August 9, 2000 Affidavit of Ramon (hereinafter "Ramon Aff."), ¶¶ 8, 10–14, Def. Exh. 3

**59.** *See* Def. Exh. 4; Ramon Aff., ¶¶ 16–23, Def. Exh. 3.

**60.** *See id.;* 30(b)(6) Depos. (Additional excerpts), pp. 62–63, Def. Exh. 63.

**61.** *See* Scott Depos., Vol. II, 30–37, 56–60, 63, 135–138, Def. Exh. 7; Amended Complaint, ¶¶ 43–46, 50–56, Def. Exh. 25. Scott has not identified the headhunters to whom she was allegedly defamed, though she believes the company to be "Sales Consultants," situated in Needham, Massachusetts. Scott Depos., Vol. II, 96–101, Def. Exh. 7.

**62.** *See* Def. Exh. 36.

**63.** *See* Answer to Interrogatory 24, p. 19, Pl. Exh. 8.

that Scott was justifiably "singled out" for criticism because her sales, managerial, and administrative performance was far inferior to other Sulzer DSMs.

Scott has offered no data with respect to the administrative deficiencies, if any, of fellow DSMs that went ignored by Sulzer supervisors.[64]

### D. *Procedural Background*

Approximately one month after her termination, on July 3, 1997, Scott filed concurrently a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the United States Equal Employment Commission. In April of 1998, Scott filed this action, and in August of 2000, the defendants brought this motion for summary judgment. Scott has filed an opposition to the defendants' motion, and both parties have filed separate Statements of Material Fact pursuant to Local Rule 56.1. I turn now to address each of the claims.

## II. *LEGAL DISCUSSION*

### A. *Standard for Summary Judgment*

Fed.R.Civ.P. 56(c) provides, in pertinent part, that a court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

In ruling on a summary judgment motion, the Court must view the record and draw inferences in a light most favorable to the non-moving party. *Pignons S.A. de Mecanique de Precision, v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir.1981). "When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 12 (1st Cir.1994).

This Court must, therefore, undertake to determine (1) whether factual disputes exist, (2) whether the factual disputes are genuine (i.e. a reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence), and, (3) whether any fact genuinely in dispute is material (i.e. such that it might affect the outcome of the suit under the applicable substantive law). *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. *Claims of Gender Discrimination under Title VII (Count V) and under c. 151B (Count I)*

Broadly speaking, there are two paradigms for establishing a claim of disparate treatment. In one the plaintiff seeks to prove through either direct or circumstantial evidence that she was discriminated against on the basis of her membership in a protected class, that gender was *the* impermissible reason for adverse employment decisions.[65] In the

---

64. *See* Scott Depos., Vol. I, 150–154, 162, 185–187, Def. Exh. 7; Standley Aff. ¶¶ 5–11, 15, Def. Exh. 20; Def. Exh. 14.

65. In the usual case of disparate treatment, the plaintiff seeks to prove gender discrimination: (1) through direct evidence of intentional sex-based disparate treatment; (2) or through circumstantial discrimination, under the now familiar burden-shifting analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Title VII and c. 151B converge under the *McDonnell Douglas* framework for pretext analysis. *Abramian v.*

other, plaintiff seeks to prove that discrimination motivated the adverse decision, even if it was not the sole reason. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).[66]

### 1. *Direct Evidence*

■ There is no direct evidence—under either paradigm—that the actions of which Scott complains, her discharge, the various promotion and compensation decisions, were done because of Scott's gender, or that gender even played a part in them. Technically, direct evidence is "evidence which, if believed, proves the fact without inference or presumption." *Fernandes v. Costa Brothers Masonry, Inc.*, 199 F.3d 572, 581–83 (1st Cir.1999). In the discrimination context, it comprises "statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir.2000). *Accord Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir.1999) (en banc); *Lambert v. Ackerley*, 180 F.3d 997, 1008–09 (9th Cir.1999) (en banc); *Thomas v. NFL Players Ass'n*, 131 F.3d 198, 204 (D.C.Cir.1997).

■ Presumably, direct evidence of discrimination would involve that exceptionally rare situation where a supervisor actually admits that unlawful animus motivated his decision or played a significant part in it. *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 171 n. 8 (1st Cir.1998) ("smoking gun" evidence such as an outright admission by an employer is "rarely found in today's sophisticated employment world"); *see also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)("There will seldom be 'eyewitness' testimony as to the employer's mental processes.")

Scott claims the following evidence to be "direct": A comment made by Hamlet to Scott comparing her to his children in April of 1996,[67] a comment made by Hamlet to Scott regarding her fingernail length in his week-long visit to Boston in July of 1996,[68] a comment made by Hamlet to Scott regarding her make-up on the same trip in July of 1996,[69] and a comment made by Hamlet to Scott involving her excessive bathroom use on the same trip in July of 1996.[70]

*President & Fellows of Harvard College*, 432 Mass. 107, 116, 731 N.E.2d 1075 (2000).

66. Massachusetts has adopted the *Price Waterhouse* standard for mixed-motive claims under c. 151B. *E.g. Wynn & Wynn, P.C. v. Massachusetts Com'n Against Discrimination*, 431 Mass. 655, 729 N.E.2d 1068 (Mass.2000).

67. The memorandum in which Hamlet makes the comparison between Scott and Hamlet's children was sent in response to an attempt by Scott to circumvent Hamlet's authority after he had rebuffed a proposal submitted by Scott to institute honoraria for surgeons. Discovering that Scott had re-submitted the request to another Sulzer supervisor after he denied approval, Hamlet wrote: "When this happened with my children, going from one parent to another until they got the answer they wanted, they knew they were wrong ...

please don't put yourself in such an awkward situation." *See* Pl. Exh. 12.

68. Hamlet suggested to Scott that she cut her fingernails after he had observed Scott struggling to dial a phone with her fingertips.

69. These remarks occurred when the two were on route to a medical conference at the Tufts New England Medical Center to make a sales presentation to a group of cardiac surgeons. Immediately preceding the presentation, Scott told White that she intended to go to the bathroom to touch up her lipstick, to which Hamlet responded, in part, by assuring Scott that she had on the right amount of makeup.

70. The references to Scott's make-up and bathroom use appear to be the same comment: Hamlet informed Scott that she did not need to go to the bathroom to apply more

The statements that Scott attributes to Hamlet could raise an inference of gender bias in some situations. In a workplace environment, comments by a male superior concerning the professional appearance of a female subordinate—particularly when they concern characteristics stereotypically associated with gender (makeup, fingernail length)—may reflect certain cultural, even sexual, assumptions about women that could well influence a supervisor's behavior and decisionmaking. Reducing a woman to her physical attributes could cloak an inability or unwillingness to see her as a professional peer.

But in this setting, the comments are far from conclusive in the way "direct evidence" requires: A fact-finder would have to draw additional inferences to link Hamlet's comments to the real world employment decisions at issue, a nexus complicated by the fact that other decisionmakers, such as White and Ramon, who made no such comments, also participated in the decision to discharge her or that a number of supervisors and managers concluded that there were problems with her performance both before and after Hamlet made his remarks. *See Dominguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 n. 6 (1st Cir.2000) (the weight of stray remarks is "circumscribed if they were made in a situation temporally remote from the date of the employment decision or if they were not related to the employment decision in question or were made by non-decisionmakers").

### 2. *Circumstantial Evidence of Discrimination*

■ Under the *McDonnell Douglas* framework for circumstantial proof of discrimination, a plaintiff first must make a

makeup before the presentation. *See* Scott

prima facie showing of discrimination. If a plaintiff succeeds, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant is successful in proffering a nondiscriminatory explanation, the plaintiff must then show that the defendant's reason is a pretext to mask unlawful discrimination. 411 U.S. at 802–05, 93 S.Ct. 1817.

### a. *Prima Facie Case: Was Scott Performing Her Job at an Acceptable Level?*

■ In the first stage, Scott's burden is hardly onerous. She must show that: (1) she is a member of a protected class; (2) she performed her job at an acceptable level; (3) she was terminated; and (4) her employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's. By establishing a prima facie case, the plaintiff "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection," such as lack of competence, and thereby creates a presumption of discrimination. *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 441, 646 N.E.2d 111 (1995), (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ But however light the burden is, Scott does not meet it. She has failed to raise a genuine issue of material fact as to whether she performed her job at an acceptable level at all. The periodic reviews and evaluations in the plaintiff's file, the barrage of emails and coaching letters, and the plethora of internal memoranda exchanged between Sulzer super-

Depos., Vol. II, p. 128, Def. Exh. 7.

visors throughout Scott's employment indicate that she consistently failed to do so. In every single Performance Summary, to varying degrees, Scott was rebuked for her administrative lapses, her lack of accessibility, her inability to accept constructive criticism, the excessive degree of her business expenses, and her failure to complete such basic tasks as timely and complete expense report filing and proper audit compliance.[71] With regards to the latter deficiency, Scott's failure to account for all her valves during the course of her employment exposed Sulzer to potential liability in the event of valve recall and jeopardized Sulzer's compliance with FDA-mandated requirements that Sulzer meticulously account for every valve, implanted or otherwise.

The record indicates that Scott was equally derelict in promoting or even maintaining her level of sales. During her tenure from 1994 through 1997, Scott's sales failed to show significant improvement in all relevant categories as compared to other territories and DSMs, particularly those who began their employment concurrently with Scott in 1994. Moreover, the bulk of her successful sales accrued from a clinical trial site that was expected to continue its robust commercial relationship with Sulzer. Her ancillary successes with the Batista Program alone do not redeem Scott's deficient performance in her primary functions as a DSM.

### b. *Company's Burden and Pretext*

■ Even if, *arguendo*, plaintiff met her burden of showing a satisfactory job performance, the company's response plainly is sufficient as a matter of law. She was fired because she had serious and continuing performance problems. And even if the burden of production returned to her, she cannot show pretext, that men with like records remained in the company's employ.[72] Ultimately, as to the fundamental question of whether the plaintiff has met her initial burden of presenting circumstantial evidence sufficient to create an inference that the basis for adverse employment decisions was illegal—namely Scott's gender—the answer is clear: She has not.

### 3. *Mixed–Motive Discrimination*

■ Mixed-motive analysis applies when the evidence shows that an employer considered both a proscribed factor (such as gender) and one or more legitimate factors (such as competence) in making a challenged employment decision. *See Price Waterhouse*, 490 U.S. at 241–42, 109 S.Ct. 1775. In *Price Waterhouse*, the plurality determined that the words "because of" in Title VII do not mean "solely because of." [73] An adverse employment decision violates Title VII even if the illegitimate criterion was only one of a number of bases for the decision. To rebut a plaintiff's case-in-chief in a mixed-motive case,

---

**71.** I understand that the fact that a woman worker is rebuked to this degree may not be the end of the inquiry. She may be subject to greater scrutiny than male peers, or male peers with similar deficiencies may be treated differently. But Scott has offered no evidence of these scenarios.

**72.** Compare *McDonnell Douglas*. The plaintiff was involved in a demonstration, protesting his layoff and the company's employment practices. He, along with other laid off workers, illegally stalled his car on the roads leading to the plant. The plaintiff, among others, was arrested. When he then reapplied for his old position, the company rejected him because of his participation in the illegal stall in. He contended that the failure to hire him was pretextual; others who had also "stalled in" were rehired or remained in the company's employ.

**73.** The case was decided by a six-three split without a majority opinion.

the employer must prove that "it would have made the same decision even if it had not allowed [an illegitimate factor] to play [a motivating] role" in the employment decision. *Id.* at 242, 244, 109 S.Ct. 1775. The 1991 Civil Rights Act reaffirmed the methodology.[74]

█ The problem is that neither the Supreme Court, nor Congress outlined precisely the kind of evidence necessary to meet the plaintiff's prima facie burden of showing mixed-motive. And since the mixed-motive test is substantially easier to meet than the standard enunciated in *McDonnell Douglas,* the issue is an important one.[75]

█ The *Price Waterhouse* plurality implied that any probative evidence, direct or circumstantial, should be admissible to meet a prima facie showing under the mixed-motive approach. *See* 490 U.S. at 251–252, 109 S.Ct. 1775 ("we do not suggest a limitation on the possible ways of proving that stereotyping played a motivating role in an employment decision"). Indeed, such a preference for all types of evidence makes sense in light of general evidentiary principles that emphasize the probative value of evidence, whatever its nature or form. *See United States Postal Serv. Bd. of Govs. v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence"); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1184 (2nd Cir.1992)

("Circumstantial evidence, it should be noted, if relied upon by the jury, is of no lesser probative value than direct evidence"); *see also* Edward J. Devitt & Charles B. Blackmar, *Federal Jury Practice and Instructions* § 15.02, at 441–42 (3d ed.1977) ("[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence"). Moreover, requiring "direct" evidence to sustain a plaintiff's burden of proof was not called for by the mixed-motive paradigms on which *Price Waterhouse* relied, *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) and *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), cases that did not restrict a plaintiff's use of evidence.

In her concurrence, Justice O'Connor, contrasted the plurality's holding by proposing a more restrictive direct evidence standard. But she did not define that standard:

[S]tray remarks in the workplace, while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard. . . . Race and gender always 'play a role' in an employment decision

---

**74.** The 1991 Civil Rights Act codified at 42 U.S.C. § 2000e–2(m) states in relevant part: . . . an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

**75.** Indeed, once an employee establishes a prima facie case under a mixed-motive framework, the *burden of persuasion* shifts to the

defendant-employer, whereas under traditional pretext analysis, once an employee establishes a prima facie case, only the burden of production shifts to the employer to show a nondiscriminatory justification; however, the burden of persuasion remains throughout with the plaintiff-employee. *Price Waterhouse,* 490 U.S. at 246, 109 S.Ct. 1775; *Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 153 (1st Cir.1990).

in the benign sense that these are human characteristics of which decisionmakers are aware and about which they may comment in a perfectly neutral and nondiscriminatory fashion.... What is required is ... direct evidence that decisionmakers place substantial negative reliance on an illegitimate criterion in reaching their decision. *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J. concurring).

Several commentators have suggested that Justice O'Connor did not intend to use the phrase "direct evidence" in its usual evidentiary sense. *E.g.* Candace S. Kovacic–Fleischer, *Proving Discrimination After Price Waterhouse and Wards Cove: Semantics as Substance,* 39 Am. U.L.Rev. 615, 657 (1990). For example, the evidence offered by the plaintiff in *Price Waterhouse,* while strong proof of gender discrimination, was not necessarily *direct* evidence. The plaintiff, Ann Hopkins, was a senior manager at Price Waterhouse whose candidacy for partnership was delayed for consideration for a year. She introduced evidence that, during the evaluation process, some partners made comments about Hopkins ("too aggressive," "abrasive," "macho," even that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled ...," etc.) that were motivated by stereotypical notions about women's proper demeanor. *See id.* at 234–35, 109 S.Ct. 1775. Nevertheless, to conclude that Ann Hopkins suffered disparate treatment required an *inference:* The fact-finder would have to make the determination that the gender-stereotyped comments and attitudes of *some* partners actually infected the decision of the *full* partnership not to promote her.

Faced with this ambiguity, the decisional law has moved in a number of directions.

Some courts consider evidence "direct" in the traditional, evidentiary sense—where it alone, without inference or presumption or consideration of supporting evidence, proves the fact of discriminatory animus. *E.g. Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1207 (10th Cir.1999); *Haas v. ADVO Sys., Inc.,* 168 F.3d 732, 734 n. 2 (5th Cir.1999); *Carter v. Three Springs Resid'l Treatment,* 132 F.3d 635, 641 (11th Cir.1998); *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). Other circuits liberally construe evidence as "direct" if it is simply tied to discriminatory animus. *E.g. Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1017–18 (8th Cir.1999); *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 913 (2d Cir.1997).

The First Circuit in *Fernandes* has adopted Justice O'Connor's "direct evidence" approach, on the theory that when the Supreme Court rules by means of a plurality, inferior courts should give effect to the narrowest ground on which the majority of the Justices would agree. *Fernandes,* 199 F.3d at 580. Nevertheless, as with Justice O'Connor's concurrence in *Price Waterhouse,* the same question surrounds *Fernandes,* namely how literal the "direct evidence standard" should be.

In *Brown v. East Mississippi Electric Power Ass'n,* 989 F.2d 858 (5th Cir.1993), for example, the Fifth Circuit held that a supervisor's routine use of a notorious racial slur constituted direct evidence of discrimination, because it was an invidious word with such a charged history that its mere use proves the fact of discrimination "without inference or presumption." *Id.* at 861. At the same time the Eleventh Circuit characterized calling older employees "old bastards" and "old farts" or stating that "everyone over 35 should be sacked" as circumstantial evidence of discrimination, which, though strong, required the fact finder to draw additional inferences

connecting the attitudes to the adverse employment decision. *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1553, 1558 (11th Cir.1988). .

■■■ In effect, the two cases say the following: Anyone who uses words like those described in *Brown* has to be a discriminator; thus, the jury would not have to make further inferences to find discrimination. In contrast, the words said in *Castle* and the attitudes they reflect may or may not reflect discriminatory intent or motive; the jury would have to make that logical leap.

No matter what the standard imposed on this case, however rigorous or lenient, Scott does not meet it. There is no direct evidence here in the literal sense. There is not even direct evidence of the sort found in *Price Waterhouse*, gender-derivative remarks in the evaluative material on which the decision was based. And there is no circumstantial evidence probative of some proximate link between gender animus and an adverse employment decision. In short, Scott has failed to introduce any evidence upon which a jury could properly find that the defendants relied on an illegitimate criterion in reaching their decision.

## C. *Equal Pay Act Violation (Count IV)*

■■■ The EPA prohibits wage discrimination between employees on the basis of sex for equal work on jobs, the "performance of which requires skills, effort, and responsibility, and which are performed under similar working conditions."

29 U.S.C. § 206(d)(1). To establish a prima facie case, a plaintiff must show that the employer paid different wages to an employee of the opposite sex for substantially equal work. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

■■■ To rebut the prima facie case, the employer must establish as an affirmative defense that the wage discrepancy resulted from (1) a seniority system; (2) a merit system; (3) a system measuring earnings by quantity or quality of production, or (4) a differential based on a factor other than sex. *Id.* at 196, 94 S.Ct. 2223. Acceptable factors "other than sex" include experience, prior salary, education, skills which the employer deems useful to the position, and a proven ability to generate higher revenue for the employer's business. *E.g. Mullenix v. Forsyth Dental Infirmary for Children*, 965 F.Supp. 120, 140 (D.Mass.1996); *Dubowsky v. Stern, Lavinthal, Norgaard & Daly*, 922 F.Supp. 985, 990 (D.N.J.1996). If established, any of the four exceptions is a complete defense to conduct that would otherwise violate the statute. 29 U.S.C. § 206(d)(1).

Applying the EPA framework and viewing the record in Scott's favor, I find that disparities in pay, to the extent they existed at all, were based entirely on legitimate factors independent of sex. Of those employees who performed similar work duties requiring substantially equal levels of skill, effort, and responsibility as Scott—her fellow DSMs[76]—the record establishes that the base salaries of few male DSMs exceeded Scott's, while those whose salaries

**76.** I agree with the defendants that Scott's position as a District Sales Manager was not equivalent to those of Regional Sales Managers or Senior District Sales Managers for purposes of EPA comparison. Regional Sales Managers are more appropriately classified in middle-management than in sales, responsible as they are for supervising the three geographic sales regions. Likewise, Senior District Sales Managers have far greater responsibilities than an ordinary DSM, including overseeing the training of sales personnel, sales meetings, clinical trial activities, and emergency sales coverage.

did exceed Scott received greater compensation on the basis of superior sales, market conditions, or prior employment experience.[77] Defendants have thus met their burden of persuasion in establishing an affirmative defense. Scott has come forward with nothing other than conclusory assertions of her professed job proficiency and expertise to suggest the existence of material issues of fact as to gender-based pay deviations.

### D. Interference with Contractual Relations (Count II)

■■■■ Scott alleges that defendants White and Hamlet knowingly and intentionally induced Sulzer to break Scott's employment contract. To prevail on this claim, Scott must demonstrate that (1) she had a contract with a third party, (2) the defendants knowingly induced the third party to break that contact, (3) the defendants' interference was improper in motive or means, and (4) the plaintiff was harmed by the interference.

■■■■ More specifically, in the employment and discharge context, the law protects a corporate official's freedom of action by requiring proof that the official acted with some purpose unrelated to a legitimate corporate interest, such as spite or malice. *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 663–664, 429 N.E.2d 21

(1981). A defendant may escape liability if the interference was privileged as part of his employment responsibilities, particularly where the actions were taken by corporate officers and directed toward corporate purposes. *Caverno v. Fellows*, 300 Mass. 331, 337, 15 N.E.2d 483 (1938) (officials should try to advance the corporate interest without the ever-present fear of personal liability).

■■■■ Considering these factors, I find that summary judgment is entirely appropriate.[78] Having relied entirely on her insufficient claim as to the defendants' gender animus to demonstrate malice, Scott has produced no other evidence to demonstrate a spiteful or malignant purpose on the part of White and Hamlet, independent of their concern for Sulzer's legitimate business interests, to interfere with her employment contract.

### E. Libel and Slander (Count III)

■■■■ Finally, I grant summary judgment on Scott's libel and slander claim.[79] To maintain an action for slander, Scott must prove that a false assertion of fact specifically identifying her was communicated orally to a third party, thereby resulting in special damages. *Craig v. Proctor*, 229 Mass. 339, 341, 118 N.E. 647 (1918). The tort of libel is proved by the

---

77. *See* discussion and accompanying notes *supra*, comparing Scott's compensation to fellow DSMs. To summarize, the record manifests that few male DSMs exceeded Scott in base pay, and that those who did each received higher performance summaries than Scott and outperformed her in virtually every indicator of proficiency employed by Sulzer. Furthermore, to the extent that Scott's position as DSM may have entailed certain responsibilities similar to those required of an SDSM, any difference in compensation was based on merit—both Dwyer and Colaizzi consistently received better performance evaluations than Scott.

78. Defendants claim that because Scott's contract with Sulzer was at will, she has no cognizable claim for the tort of interference with contractual relations. I am not persuaded by this argument because even a contract at will vests a valuable contract right which requires protection against unlawful interference. *See Restatement (Second) of Torts* § 766, Comment 127 g, pp. 10–11 (1977).

79. In general, summary judgments are favored in defamation cases. *Mulgrew v. Taunton*, 410 Mass. 631, 632, 574 N.E.2d 389 (1991).

publication of defamatory matter by written or printed means.

Scott alleges that she was defamed by the following:

(1) The "coaching letter" sent by Hamlet to Scott as a follow-up to his July, 1996, visit and published in Scott's personnel file;

(2) A voicemail message sent by Hamlet to Scott's fellow DSMs stating that Scott was ill-prepared and disorganized; [80]

(3) White's statements to headhunters concerning Scott's poor performance;

(4) White's statements to Ed Duggan, then employed by a third party with whom Scott was interviewing for employment post-termination, of Scott's poor performance; and,

(5) Slanderous statements made by Hamlet and White to customer contacts.

■ The first claim fails because the coaching letter and any other internally circulated verbal or written criticisms of Scott's performance are absolutely privileged. An employer has a conditional privilege to disclose defamatory information concerning an employee when the "publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." *Bratt v. International Business Machs. Corp.*, 392 Mass. 508, 509, 467 N.E.2d 126 (1984). *See also Restatement (Second) of Torts* § 594, comments e and f, at 265–266 (1977).

For the defendants to lose their conditional privilege to publish defamatory material, Scott must prove that Hamlet and White published the information recklessly. *Bratt*, 392 Mass. at 517, 467 N.E.2d 126. Yet there is simply no evidence to suggest that Hamlet prepared his coaching letter (or for that matter any internally published critiques of Scott's performance) with reckless disregard for its truth or falsity.[81] The coaching letter was an internal business communication, drafted by an executive in the service of his employer's legitimate business interests. Hamlet disseminated the letter only to corporate officials whose duties required them to be aware of Scott's performance; it reflects nothing more than Hamlet's perceptions of Scott's performance after he paid her territory a visit in 1996. Notably, Scott has introduced nothing that makes me doubt the reasonableness of Hamlet's belief that his criticisms were well grounded. Accordingly, Hamlet has not forfeited his conditional privilege on the basis of recklessness. *See Restatement (Second) of Torts* § 594, cmt. i (1977) ("It is enough that the publisher reasonably believes that the recipient is able to render assistance or that his knowledge of the defamatory matter may be useful in the protection or advancement of the interest in question").

■ The second claim fails for a number of reasons. First, there is no evidentiary support for the fact that Hamlet forwarded the voicemail.[82] Second, as I am uncertain as to the precise content of the voicemail, I cannot safely say that it is

---

80. *See* Scott Depos., Vol. I, 197–199, Def. Exh. 64.

81. Reckless disregard for the truth exists only if the publisher had serious doubts as to the truth or a high degree of awareness of the probable falsity of the statements prior to publication. *Bratt*, 392 Mass. at 515, 467 N.E.2d 126.

82. Despite having claimed possession of a tape recording of the alleged voicemail, Scott hat yet to produce a copy despite repeated requests. *See* Scott Depos., Vol. I, 197–199, Vol. III, 8–9, Def. Exh. 64.

not protected by the *Bratt* conditional privilege. From Scott's allegations, it appears that Hamlet was acting well within his legitimate capacity as a corporate executive responsible for the Sulzer sales force when he forwarded the voicemail only to Sulzer DSMs. Again, where the publisher and the recipient have a common interest, and the communication is reasonably calculated to protect or further it, Massachusetts law privileges such a communication.

■■■■■ Lastly, the voicemail is but an expression of Hamlet's opinion based on first-hand experience he acquired after his week-long visit with Scott. In order for an opinion to be actionable, the "undisclosed facts must be defamatory." *Cole v. Westinghouse Broadcasting Co.*, 386 Mass. 303, 313, 435 N.E.2d 1021 (1982).[83] In determining whether an opinion incorporates underlying defamatory facts, I consider the context in which the opinion was uttered or published, the words used, the cautionary terms used by the person publishing the statement, the medium by which the statement was disseminated, and the audience to which it was published. *Myers v. Boston Magazine Co., Inc.*, 380 Mass. 336, 343–344, 403 N.E.2d 376 (1980).

In the present case, assuming that undisclosed facts are even implied, it is unclear what they are or in what way they are defamatory. Indeed, the facts underlying the alleged voicemail may relate to Hamlet's observations of Scott during his week-long visit, or to documented examples of Scott's performance, or to references made by third parties, or to comments made by Scott herself.

Furthermore, "disorganized" and "ill-prepared" are broad descriptive terms, susceptible to varying interpretations. Consequently, anyone listening to the voicemail would be likely to treat Hamlet's remarks as reflecting nothing more than his very generalized opinion rather than associate the words with any particular set of facts. *See Friedman v. Boston Broadcasters, Inc.*, 402 Mass. 376, 379–80, 522 N.E.2d 959 (1988) (calling plaintiffs "insurance crooks," who engaged in "insurance fraud" was likely to be considered a statement of opinion rather than fact). In short, the voicemail cannot reasonably be understood to imply that Hamlet's opinion and quoted conclusions were arrived at on the basis of undisclosed defamatory facts.

■■■■ The third, fourth, and fifth claims fail because they are based not on Scott's personal knowledge, but rather on either unsubstantiated or inadmissible hearsay evidence. *See* Fed.R.Civ.P. 56(e) (affidavits used in support of or in opposition to a motion for summary judgment must be made either on personal knowledge or on the basis of facts that would otherwise be admissible in evidence). Indeed, Scott has conceded that she was not personally present when White or Hamlet allegedly defamed her to headhunters, potential employers, or to client contacts, and has failed even to identify the third-party conversants who recounted to her the conversations in which Scott was allegedly defamed.[84] Summary judgment befits claims, such as these, that are premised exclusively on uncorroborated secondhand accounts. *See Madsen v. Erwin*, 395 Mass. 715, 721, 481 N.E.2d 1160 (1985) ("Conclusory statements, general denials,

---

**83.** Statements of pure opinion are protected by the First Amendment and are, therefore, not actionable in a defamation suit. *See Gertz v. Robert Welch Inc.*, 418 U.S. 323, 339–340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (as a society we value the marketplace of competing opinions and rely on competition, rather than censure, as a mechanism for silencing).

**84.** *See* Scott Depos., Vol. II, 96, 99–101, 150–56, Vol. III, 65–67, Def. Exh. 7.

and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment"); *Shapiro Equip. Corp. v. Morris & Son Constr. Corp.*, 369 Mass. 968, 341 N.E.2d 668 (1976), citing *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) ("All affidavits or portions thereof made on information and belief, as opposed to personal knowledge, are to be disregarded in considering a motion for summary judgment").

## III. *CONCLUSION*

I find that there exists no genuine issue of material fact with regard to Scott's claims of discrimination based on gender, impermissible pay disparities, interference with contractual relations, and libel and slander. Therefore, for the reasons stated above, the defendants' motion for summary judgment is **GRANTED.**

**SO ORDERED.**