

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00305-CV

_____

UNIVERSITY OF NORTH TEXAS HEALTH SCIENCE CENTER, Appellant

V.

MARCY PAUL, Appellee

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-318489-20

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

## I. INTRODUCTION

This appeal by the University of North Texas Health Science Center (UNTHSC), a governmental entity, involves whether the trial court erred by failing to dismiss, on jurisdictional grounds, appellee Marcy Paul's[1] age- and sex-related employment-discrimination claims. We affirm in part and reverse and render in part.

## II. BRIEF BACKGROUND

UNTHSC employed Paul from February 12, 2011, through January 31, 2020, in its Department of Health Behavior and Health Systems (Department) within the School of Public Health (the School). Paul was initially hired as a nontenure-track instructor but was promoted to nontenure-track assistant professor after she obtained a PhD in Multicultural Women's and Gender Studies, with a minor concentration in health studies, from Texas Woman's University in 2016. Paul was employed via one-year contracts that were issued annually—"almost automatically"—unless UNTHSC notified the employee that the contract was not being renewed.

Paul was over fifty years old when UNTHSC initially hired her. Her undergraduate and master's degrees were in the communications field, but her later expertise, including the topic of her PhD dissertation, was infant mortality.

___

[1]To save space and maximize readability, we do not use honorific titles in nonquoted material in this memorandum opinion.

As both an instructor and assistant professor, Paul taught community-health courses and maternal-and-child-health (MCH) courses, obtained grant funding, and supervised doctoral students. From 2015 through 2018, Paul's performance reviews indicated that she met or exceeded expectations in most rated categories. But in response to one of Paul's self-evaluative comments in her September 2018 review[2]— "[I]f I don't trust [someone], I will sometimes have an interpersonal break of good communication"—then-Department Chair Scott Walters wrote, "I agree with her that her style can come off as abrasive at times." Contending that the use of the term "abrasive" to describe a woman is inherently sexist, Paul appealed the evaluation to then Dean of the School, Thomas Thombs, but he found the comment to be reasonable.

In December 2018, the School posted a position for a tenure-track MCH Assistant/Associate/Full Professor[3] in the Department. Paul applied, but the School hired another woman for the position, Stacey Griner, who was younger than Paul and under forty. In January 2019, the School sought a new Department Chair, and Paul applied. Again, Paul was not selected.

---

[2]In some places, the record refers to evaluations by fiscal-year date; we use the signature date listed on the evaluations.

[3]At UNTHSC, instructor is the "earliest rank," and promotions can occur to assistant professor, then to associate professor (a middle rank), and, ultimately, to full professor. Both tenure-track and nontenure-track professors teach, but tenure-track professors "have more substantial research duties."

3

On February 1, 2019, UNTHSC sent Paul a letter stating that it was not renewing her assistant-professor contract. Although the letter did not give a reason, according to UNTHSC, Paul had refused to cooperate with changes to its master's-in-public-health internship program. Paul's last day of work with UNTHSC was January 31, 2020. According to Paul, UNTHSC distributed her classes to several younger women: Griner; a nontenure-track assistant professor Paul described as having "no background"; and two graduate students. Paul testified that all of them are at least twenty years younger than she.

Paul sued UNTHSC, pleading claims for Labor Code prohibited age discrimination, sex discrimination, and retaliation related to UNTHSC's (1) failure to hire her for the tenure-track position for which Griner was hired, (2) failure to promote her to Department Chair, and (3) failure to renew her one-year teaching contract.[4] UNTHSC filed a plea to the jurisdiction on sovereign-immunity grounds, which the trial court denied for all claims. UNTHSC then filed this interlocutory appeal.

On appeal, Paul concedes that the trial court did not have subject-matter jurisdiction over her three claims related to UNTHSC's failure to promote her to Department Chair. But as Paul points out in her brief—unchallenged by UNTHSC—UNTHSC has not complained on appeal about the trial court's denial of its plea to

---

[4]In her live pleading, the first amended petition, Paul asserts that she "was subjected to failure to hire *and* discharge due to her sex (female) *and* age (61)." [Emphasis added.] Paul brought nine claims in all.

4

the jurisdiction on her retaliation claims for the contract nonrenewal and failure to hire.[5] Thus, in this appeal, we are concerned only with whether the trial court erred by denying UNTHSC's plea to the jurisdiction on Paul's age- and sex-discrimination claims for (1) failing to hire her as a tenure-track professor and (2) failing to renew her contract.

## III. STANDARD OF REVIEW AND SUBSTANTIVE LAW

### A. STANDARD OF REVIEW

To invoke the trial court's subject-matter jurisdiction, the plaintiff must allege facts that affirmatively demonstrate that the court has jurisdiction to hear the case. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A plea to the jurisdiction is an appropriate procedural vehicle by which a party may challenge a trial court's subject-matter jurisdiction. *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 639 (Tex. 1999). When a plea to the jurisdiction challenges the existence of jurisdictional facts, as in this case, the court considers the evidence submitted when resolving the jurisdictional issue. *Miranda*, 133 S.W.3d at 227. "If the evidence creates a fact question regarding the jurisdictional

---

[5]"A retaliation claim is related to, but distinct from, a discrimination claim, and one may be viable even when the other is not. Unlike a discrimination claim, a retaliation claim focuses on the employer's response to an employee's protected activity, such as making a discrimination complaint." *Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 763–64 (Tex. 2018). UNTHSC had contended in the trial court that the retaliation claims are barred because Paul had not included them in her Equal Employment Opportunity Commission (EEOC) complaint. But UNTHSC does not make the same argument on appeal.

5

issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227–28. But if the jurisdictional evidence is undisputed or fails to raise a fact question, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

We review a trial court's ruling on a plea to the jurisdiction de novo. *Id.* As with the summary-judgment standard of review, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Id.* However, we cannot disregard evidence necessary to show context or disregard unfavorable evidence if reasonable jurors could not disregard it. *Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 771, 793 (Tex. 2018). To create a fact question, the nonmovant must present more than a scintilla of probative evidence on each challenged jurisdictional fact. *See Miranda*, 133 S.W.3d at 227–28; *see also* Tex. R. Civ. P. 166a(c) (setting out traditional summary-judgment review standard); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004) ("A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced."). More than a scintilla of evidence exists when the evidence allows reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharm. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

## B. SOVEREIGN IMMUNITY

Sovereign immunity deprives a trial court of subject-matter jurisdiction over suits against the State and certain governmental units unless the governmental unit has

6

consented to suit or immunity has been waived. *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011); *Tex. Health & Hum. Servs. v. Enriquez*, 642 S.W.3d 21, 30 (Tex. App.—El Paso 2021, no pet.). The Texas Legislature has provided a limited immunity waiver for claims against governmental units that allege violations of the Texas Commission on Human Rights Act (TCHRA). Tex. Lab. Code Ann. § 21.254; *Mission Consol. ISD v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). This waiver extends only to suits in which the pleadings state a prima facie claim for a TCHRA violation. *Alamo Heights ISD*, 544 S.W.3d at 763, 770 ("The TCHRA waives immunity, but only when the plaintiff states a claim for conduct that actually violates the statute."); *Tex. Health & Hum. Servs. v. Sepulveda*, No. 08-22-00043-CV, 2023 WL 2529747, at *2 (Tex. App.—El Paso Mar. 15, 2023, no pet.); *Tex. Dep't of Crim. Just. v. Flores*, 555 S.W.3d 656, 661 (Tex. App.—El Paso 2018, no pet.).

## C. SUBSTANTIVE LAW

The Texas Labor Code prohibits government employers from discriminating against protected employees because of sex or age.[6] Tex. Lab. Code Ann. § 21.002(8)(D) (defining "[e]mployer" to include a "state agency" or "state instrumentality"), § 21.051 (prohibiting discrimination and defining it to include the failure or refusal to hire or a discharge). An employer commits an unlawful employment practice under the statute because of an employee's sex or age if the

---

[6]The protection from age discrimination applies only to persons forty years old or older. Tex. Lab. Code Ann. § 21.101.

employee's sex or age was "a motivating factor" for the practice, "even if other factors also motivated the practice." *Id.* § 21.125(a).

The requirements for establishing a prima facie case under TCHRA "vary depending on the circumstances." *Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020).

To establish a prima facie case of sex discrimination under the TCHRA for the failure to renew her contract, Paul had to present evidence that (1) she is a protected-class member (in this case, female), (2) she was qualified for the position at issue, (3) UNTHSC took an adverse employment action against her, and (4) she was replaced by a male employee or otherwise treated less favorably than similarly situated female employees.[7] *Edcouch-Elsa ISD v. Cabrera*, No. 13-21-00365-CV, 2022 WL 3257377, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 11, 2022, no pet.) (mem. op.). To establish a prima facie case of age discrimination for the nonrenewal, Paul

---

[7]For this claim, Paul alleges that UNTHSC engaged in sex stereotyping by declining to renew her contract because of a subjectively held belief about sex stereotypes—that she did not appear youthful or attractive enough or was too abrasive for a woman—and thus treated her less favorably than youthful, attractive, and less abrasive female employees. In such cases, some courts have described the fourth element of the test more broadly as requiring a showing only that the adverse employment action was made "under circumstances giving rise to an inference of discrimination." *Potter v. Synerlink Corp.*, 562 F. App'x 665, 674 (10th Cir. 2014); *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039–40 (8th Cir. 2010) (holding that if plaintiff chooses to offer comparative evidence, court should examine whether such evidence is sufficient proof, but noting that comparative evidence is not the "exclusive means by which a plaintiff may establish an inference of discrimination" (quoting *Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998))). We discuss the applicable standard in more detail in Section VI below.

needed to show that she (1) was a member of the protected class (forty or older); (2) was qualified for the position; (3) suffered a final, adverse employment action; and (4) was either (a) replaced by someone significantly younger or (b) otherwise treated less favorably than others similarly situated but outside the protected class. *Tex. Tech Univ. Health Scis. Ctr.*, 612 S.W.3d at 305; *City of Richland Hills v. Childress*, No. 02-20-00334-CV, 2021 WL 4205013, at *4 (Tex. App.—Fort Worth Sept. 16, 2021, pet. denied) (mem. op.).

To make out a prima facie case of sex and age discrimination for failure to hire her for the tenure-track position, she had to show that (1) she belongs to a protected class; (2) she applied for and was qualified to fill the position; (3) despite her qualifications, she was not hired or was rejected; and (4) UNTHSC filled the position with a person outside the protected class or the position remained open after UNTHSC rejected Paul. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186–87, 109 S. Ct. 2363, 2378 (1989); *Tex. Dep't of Aging & Disability Servs. v. Lagunas*, 546 S.W.3d 239, 252 (Tex. App.—El Paso 2017, no pet.); *Elgaghil v. Tarrant Cnty. Junior Coll.*, 45 S.W.3d 133, 139 (Tex. App.—Fort Worth 2000, pet. denied).

Because the TCHRA is modeled after federal law, we consider analogous federal cases as well as Texas cases when reviewing employment-discrimination issues. *B.C. v. Steak N Shake Operations*, 512 S.W.3d 276, 279 (Tex. 2017); *see* Tex. Lab. Code Ann. § 21.001. We also "follow the [United States Supreme Court's] settled approach

9

[of employing one of] two alternative methods of proof in discriminatory treatment cases":

> The first method, rather straightforward, involves proving discriminatory intent via direct evidence of what the defendant did and said. However, the High Court recognized that motives are often more covert than overt, making direct evidence of forbidden animus hard to come by. So to make matters easier for discrimination plaintiffs, the Court created the burden-shifting mechanism of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 1824–25 (1973)]. Under this framework, the plaintiff is entitled to a presumption of discrimination if she meets the "minimal" initial burden of establishing a prima facie case of discrimination.

*Mission Consol. ISD*, 372 S.W.3d at 634 (internal citations omitted).

If the plaintiff establishes a prima facie case, the defendant must rebut the resulting discrimination presumption by establishing a legitimate, nondiscriminatory reason for the employment action. *Tex. Tech Univ. Health Scis. Ctr.*, 612 S.W.3d at 305. To satisfy that burden, the employer must present evidence that is legally sufficient, admissible, and of sufficient clarity. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255–56, 101 S. Ct. 1089, 1094–95 (1981); *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000) (noting that this burden is "one of production, not persuasion" and thus does not involve any credibility assessment). Once the employer does so, the plaintiff must then overcome the rebuttal evidence by establishing that the defendant's stated reason is a mere pretext. *Alamo Heights ISD*, 544 S.W.3d at 782. Otherwise, the case

must be dismissed. *City of Houston v. Garner*, No. 14-20-00688-CV, 2022 WL 2678850, at \*4 (Tex. App.—Houston [14th Dist.] July 12, 2022, pet. denied) (mem. op.).

## IV. NO DIRECT EVIDENCE

Paul contends that she produced direct evidence of both sex and age discrimination, thus dispensing with the need for this court to perform a *McDonnell Douglas* burden-shifting analysis. Based on case law, we disagree.

Although direct evidence of discrimination is rare, *Alamo Heights ISD*, 544 S.W.3d at 782, its presence eliminates the need to use the *McDonnell Douglas* burden-shifting framework, *Tex. Southmost Coll. v. Hernandez*, No. 13-21-00454-CV, 2023 WL 406174, at \*5 (Tex. App.—Corpus Christi–Edinburg Jan. 26, 2023, pet. filed) (mem. op.). "Direct evidence of discrimination is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Democratic Schs. Rsch., Inc. v. Rock*, 608 S.W.3d 290, 307 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 433 (Tex. App.—Houston [1st Dist.] 2016, pet. denied)). Thus, "[i]f an inference is required for the evidence to be probative as to the employer's discriminatory animus in making the [adverse] employment decision, the evidence is circumstantial, not direct." *Donaldson*, 495 S.W.3d at 433 (quoting *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653–54 (Tex. App.—Dallas 2012, no pet.)); *see also Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

11

Statements and remarks may serve as evidence of discrimination only if they are (1) related to the employee's protected class, (2) close in time to the employment decision, (3) made by an individual with authority over the employment decision, and (4) related to the employment decision at issue. *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 593 (Tex. 2008) (citing *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 608 (5th Cir. 2007)). Generally, statements that courts have found to constitute direct evidence of discrimination are insults or slurs made against a protected group. *Jespersen*, 390 S.W.3d at 654; *see also Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (finding open racial slurs to be direct evidence of discrimination). Stray remarks cannot establish discrimination. *AutoZone*, 272 S.W.3d at 592; *see also Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152–53 (5th Cir. 1995).

Paul contends that Walters's use of the term "abrasive" about her in the 2018 performance review is direct evidence of sex discrimination. But, standing alone, use of the term to describe a woman requires an inference of sexism; thus, in this context, it cannot serve as direct evidence of sex discrimination. *See Glynn v. City of Stockton*, No. 2:15-cv-00529-KJM-CKD, 2016 WL 4009809, at *6, *9 (E.D. Cal. July 26, 2016, order); *Edcouch-Elsa ISD*, 2022 WL 3257377, at *7; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S. Ct. 1775, 1791 (1989) ("Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision."); *id.* at 293 n.5, 109 S. Ct. at 1813 n.5 (Kennedy, J., dissenting) (noting, in characterizing unchallenged expert's testimony, that "Fiske purported to

12

discern stereotyping in comments that were gender neutral—*e.g.,* 'overbearing and abrasive'—without any knowledge of the comments' basis in reality and without having met the speaker or subject"); *Scott v. Sulzer Carbomedics, Inc.*, 141 F. Supp. 2d 154, 175 (D. Mass. 2001) ("Nevertheless, to conclude that [the *Price Waterhouse* plaintiff] suffered disparate treatment required an *inference:* The fact-finder would have to make the determination that the gender-stereotyped comments and attitudes of *some* partners actually infected the decision of the *full* partnership not to promote her."). Thus, we conclude that no direct evidence of sex discrimination exists.

Paul also contends that the record shows direct evidence of age discrimination. Paul testified in her deposition that when the School hired Griner, Thombs said during a meeting "that he was bringing in someone with new, young ideas" and that he had described Griner as "young[,] with new ideas." But these comments, too, require an inference: they are direct evidence that Griner was young but not that UNTHSC did not hire Paul because she was too old. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 896 (6th Cir. 2020) ("Even if SCHRA wanted to attract young people, that says *nothing* about terminating older employees."); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) ("The most probative piece of alleged direct evidence cited by Appellants is a comment that 'what the company needed was aggressive *young* men . . . to be promoted.' . . . [T]he comment still requires us to *infer* that Soto's interest in promoting young men motivated his decision to terminate Kanafani."); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081

13

(11th Cir. 1990) ("One example of direct evidence would be a management memorandum saying, 'Fire Earley—he is too old.'"); *Tex. State Off. of Admin. Hearings v. Birch*, No. 04-12-00681-CV, 2013 WL 3874473, at *16 (Tex. App.—San Antonio July 24, 2013, pet. denied) (mem. op.) ("To consider this statement [that the decisionmaker wanted to "attract younger talent"] as an acknowledgement of discrimination we would have to infer that [the decisionmaker's] desire to hire younger ALJs meant that [he] intended to take adverse employment action against the older ALJs . . . ."). Thus, Paul did not proffer any direct evidence to support a prima facie case of age discrimination. We therefore consider UNTHSC's issues, which require us to apply the circumstantial-evidence burden-shifting analysis from *McDonnell Douglas*.

## V. FAILURE-TO-HIRE CLAIMS (PRIMA FACIE CASE)

UNTHSC contends in its first issue that Paul failed to meet her burden to establish a prima facie case on her failure-to-hire claims because she failed to present evidence raising a fact issue on her qualifications.

The standard for establishing a prima facie case is "not onerous." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228, 135 S. Ct. 1338, 1354 (2015). A court reviewing whether a plaintiff has established a prima facie case on the qualification element considers only whether the plaintiff met *objective* hiring criteria; review of whether the plaintiff satisfied subjective hiring criteria is inappropriate at the prima facie stage because doing so would eliminate the need for the third step of the

14

*McDonnell Douglas* analysis: pretext. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681 (5th Cir. 2001); *see Sepulveda*, 2023 WL 2529747, at *5 (reviewing whether plaintiff met objective hiring criteria). Accordingly, whether a plaintiff has shown that she met subjective hiring criteria is dealt with at that later stage of the analysis. *Medina*, 238 F.3d at 681.

Here, the job posting for the tenure-track professor position listed the following "Minimum Qualifications" as "required": (1) a "PhD or equivalent in Public Health, or [a] closely related field"; (2) "[r]ecognition or promise of outstanding contributions as a scholar"; (3) "[s]uccessful record or promise of sponsored research and ability to foster a collaborative program of research"; (4) "[e]nthusiasm for teaching"; and (5) "[c]ommitment to inter-professional education and interdisciplinary research." The position description noted that the Department was seeking a "tenure-track Assistant, Associate[,] or Full Professor rank in the field of Maternal and Child Health," who would "be expected to teach graduate courses and maintain an independent program of research."

UNTHSC argues (1) that Paul's PhD was in humanities, not public health or a field closely related to public health; (2) that nothing in the record showed that Paul had received recognition for or showed the promise of outstanding contributions as a "researcher" because while employed at UNTHSC, she "had not been the first author of even a single peer-reviewed scientific article" and had not published any research at her previous employer; (3) that she did not have a research-based degree or sufficient

15

research training in research methods and statistical analysis; and (4) that she had never received a research grant. Paul contends that she was "qualified by virtue of her reviews, promotions, the job posting[,] and the fact that she was given interviews[8] for the vacant position[], and the position remained open and UNTHSC continued to seek candidates for the position for persons of [her] qualifications."

Although the evidence showed that Paul does not have a PhD in public health, it does show that she has a PhD in Multicultural Women's and Gender Studies; whether that degree is "equivalent" to a PhD in public health is a subjective inquiry. *See Antol v. Perry*, 82 F.3d 1291, 1303 (3d Cir. 1996) (noting that determination of whether candidate's experience was equivalent to three years of college or to another candidate's experience was a subjective inquiry); *Equivalent*, Black's Law Dictionary (11th ed. 2019) (defining as "[e]qual in value, force, amount, effect, or significance [or] *[c]orresponding in effect or function*; nearly equal; virtually identical" (emphasis added)). Therefore, determining whether Paul's degree is equivalent to a public-health or public-health-related degree is inappropriate at the prima facie stage. *See Medina*,

---

[8]In her deposition, Paul had denied being interviewed for the tenure-track position. But at oral argument, she urged that the evidence showed she could have been interviewed for the position. In a post-submission brief, she clarified that she had based her assertion that she had been interviewed on Thombs's equivocal testimony in his deposition: "She was interviewed. I'm certain she was interviewed -- no, I can't say I'm certain. No, I can't recall if the search committee interviewed her or not." She contended that "[a] finder of fact could infer from this testimony that [Thombs] thought . . . Paul *should have been interviewed* for the position." [Emphasis added.]

16

238 F.3d at 891. Because the remaining job-posting criteria are likewise subjective,[9] we will not consider them in this part of the analysis.[10] *See id.* Additionally, although the parties disputed at oral argument whether the record shows that UNTHSC interviewed Paul for the tenure-track position,[11] we need not consider whether it did in determining whether Paul pleaded a prima facie case. We therefore overrule UNTHSC's first issue.

## VI. CONTRACT NONRENEWAL (PRIMA FACIE CASE)

In its second issue, UNTHSC contends that Paul failed to establish a prima facie case of age and sex discrimination for her contract nonrenewal because she did

---

[9]Paul said of Griner's background, "She's very smart, but she did not do the same kind of work I did."

[10]Additionally, even if the plaintiff did not meet all of the objective posted requirements, "posted minimum requirements" do not always "dictate which applicants are qualified and which are not." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 465 (6th Cir. 2003). "When neither the plaintiff nor the selectee meets all the stated criteria, the qualified prong is satisfied . . . because a genuine issue of material fact arises as to whether the posted standards actually dictated whether [the p]laintiff was qualified." *Id.* at 466; *see also Johnson v. Louisiana*, 351 F.3d 616, 623–25 (5th Cir. 2003) (holding that district court erred by deciding whether plaintiffs had met only posted objective hiring criteria when employees actually hired did not and that district court should have instead considered whether the plaintiffs had shown themselves to be qualified "by the standards applied to those actually hired").

[11] The relevance of an interview appears to be related to Paul's argument that she was qualified for the position. When Thombs was asked in his deposition, "If she was interviewed for that position, that's an indication that she met at least the basic requirements for the position[,] correct?" he answered that it was "possible she could not have met the qualifications and . . . maybe the search committee interviewed her as a courtesy."

17

not present evidence "that she was treated less favorably than younger or male comparators." Paul contends that she brought forward sufficient evidence that she was discriminated against because of her age and failure to meet an expected sex stereotype and that she was replaced by someone not only significantly younger, but also with stereotypical female qualities of "non-abrasiveness"[12] and "youthful attractiveness."

With respect to Paul's age-discrimination claim, the evidence shows that UNTHSC distributed the classes that she had taught among Griner and other younger employees, all of whom were outside the protected class.[13] A terminated employee is not necessarily considered replaced by a person who takes over only part of the employee's job duties. *E.g., Tex. Southmost Coll.*, 2023 WL 406174, at *8. But for purposes of establishing a prima facie case, such evidence can be sufficient if it raises a fact issue as to whether an existing employee's new duties "are so similar to the plaintiff's former duties that a reasonable juror could conclude that the existing employee actually took or was placed in the plaintiff's former job or position." *See Tex. Tech Univ. Health Scis. Ctr.*, 612 S.W.3d at 307–08 (holding evidence sufficient to

---

[12]Nothing in the record speaks to Griner's "non-abrasiveness." Other than her professional attributes, the record contains a photograph of Griner, Paul's description of her as "blond, [with] long hair, [and] athletic," and Paul's characterization of Thombs's description of Griner as "young[,] with new ideas."

[13]Thus, as UNTHSC notes, this is not a "true replacement" case, i.e., one in which "the plaintiff simply demonstrates that she was removed from her position and a new employee was hired to fill that same position and take over the same duties." *See Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 306 (Tex. 2020).

18

create a fact issue on replacement when "the plaintiff was removed from her position, that position was not filled, an existing employee was given a new and different position, and the existing employee was assigned some but not all of the plaintiff's former duties"); *see also Spears v. La. Coll.*, No. 20-30522, 2023 WL 2810057, at *4 (5th Cir. Apr. 6, 2023) ("Employers may not circumvent Title VII protections by 'fractioning' an employee's job.").

The evidence showed that after Paul's contract was not renewed, Griner—younger than Paul by over twenty years—took over at least some of Paul's classes and that she taught MCH. Paul's other classes were taught by a younger nontenure-track assistant professor and two graduate students. We conclude this evidence raises a fact issue on Paul's age-discrimination claim related to her contract nonrenewal. *See Tex. Tech Univ. Health Scis. Ctr.*, 612 S.W.3d at 307–08.

But the evidence fails to raise a fact issue on Paul's sex-discrimination claim. Paul alleges that she was replaced by women, so she had to show that she was treated less favorably than similarly situated female employees. *Id.* at 311–12; *Edcouch-Elsa ISD*, 2022 WL 3257377, at *8. "Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Tex. Tech Univ. Health Scis. Ctr.*, 612 S.W.3d at 312 (quoting *Ysleta ISD v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005)). Although the employees need not have identical circumstances, "they must be 'nearly identical.'" *Id.* (quoting *AutoZone*, 272 S.W.3d at 594; *Ysleta ISD*, 177 S.W.3d at 917 n.3).

"Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'" *Id.* (quoting *AutoZone*, 272 S.W.3d at 594). Here, other than the fact that Paul and Griner taught in the same Department and taught some of the same classes, Paul did not bring forward evidence sufficient to raise a fact issue on whether she and Griner were similarly situated for purposes of a sex-discrimination claim. *See Edcouch-Elsa ISD*, 2022 WL 3257377, at *8.[14]

We overrule UNTHSC's second issue with regard to Paul's age-discrimination claim for her contract nonrenewal, but we sustain it with regard to Paul's sex-discrimination claim for her contract nonrenewal.

---

[14]Paul also cites *Lewis v. Heartland Inns of America, L.L.C.*, for the proposition that she need not present evidence of a comparator if the evidence shows that the reason for nonrenewal of her contract was her failure to conform to a sex stereotype. 591 F.3d at 1041–42 (concluding that Lewis had established a prima facie case of sex discrimination when one of the persons responsible for her termination "consistently indicated that female front desk workers must be 'pretty,' . . . criticized Lewis'[s] lack of the 'Midwestern girl look' in the same conversation in which she ordered [Lewis's supervisor] to move Lewis back to the night audit[, and even though she had] authorized [the supervisor] to hire Lewis over the phone, . . . demanded a 'confirm/endorse' interview once she saw Lewis'[s] 'tomboyish' appearance"). The problem with this argument is that no evidence other than Paul's subjective belief indicates that Paul's appearance—compared with stereotypical sex-based expectations—rather than her purported nonstereotypical demeanor, as allegedly articulated by Walters, motivated UNTHSC to replace her with Griner. Certainly, no conclusion about whether Griner's demeanor conforms to sex stereotypes can be drawn from her appearance alone.

## VII. LEGITIMATE, NONDISCRIMINATORY REASONS PROFERRED AND PRETEXT EVIDENCE SUFFICIENT

Finally, in its third issue, UNTHSC contends that Paul failed to present sufficient evidence that its legitimate, nondiscriminatory reasons for declining to hire her for the tenure-track position (age- and sex-discrimination[15] claims) and for declining to renew her teaching contract (age-discrimination claim only) were merely a pretext for discrimination. Paul not only disagrees, but she also argues that UNTHSC failed to establish a legitimate, nondiscriminatory reason for deciding not to renew her contract because it failed to clearly identify who was responsible for making that decision. After setting out the applicable law on pretext,[16] we first address Paul's failure-to-hire claim.

### A. REQUIRED EVIDENTIARY SHOWING FOR PRETEXT

An adverse employment action is unlawful under the TCHRA when age or sex was "a motivating factor" for the action, even if other factors also motivated the action. *Univ. of Tex. Sw. Med. Ctr. v. Vitetta*, No. 05-19-00105-CV, 2020 WL 5757393, at \*4 (Tex. App.—Dallas Sept. 28, 2020, no pet.) (mem. op.); *see also Squyres v. Heico*

---

[15]UNTHSC has not argued on appeal that Paul failed to raise a fact issue on any of the other required elements of a prima facie case of sex discrimination related to the failure to hire.

[16]Although we later briefly analyze the second *McDonnell Douglas* step in relation to Paul's contract-nonrenewal claim, we provide the law applicable to the third step here because it provides context for our discussion of the entirety of UNTHSC's third issue.

*Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015) ("The third step of the *McDonnell Douglas* analysis involves a different causation inquiry under the [federal] ADEA[17] and the TCHRA."); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001). Thus, to defeat UNTHSC's plea to the jurisdiction at the third *McDonnell-Douglas* stage, Paul had to raise a fact question on whether UNTHSC's stated reasons for not renewing her contract and for not hiring her for the tenure-track position (1) are false or not credible or (2) are not the only reasons and that unlawful discrimination was at least a motivating factor. *Tex. Health & Hum. Servs. Comm'n v. De la Cruz*, No. 13-21-00082-CV, 2023 WL 2422501, at *5 (Tex. App.—Corpus Christi–Edinburg Mar. 9, 2023, no pet.) (mem. op.); *Tex. Tech Univ. Health Scis. Ctr.–El Paso v. Flores*, 657 S.W.3d 502, 512–13 (Tex. App.—El Paso Aug. 30, 2022, pet. filed); *see Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015).

To raise a fact issue as to whether the employer's stated reason is false or not credible, the plaintiff may present evidence that the reason is not the true reason or is "unworthy of credence." *City of Richland Hills*, 2021 WL 4205013, at *6 (quoting *Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106). "An employee may show that the employer's reason is a mere pretext 'by revealing weaknesses, implausibilities, inconsistencies, or contradictions' in the evidence." *Id.* (quoting *Tex. Dep't of Transp. v. Flores*, 576 S.W.3d 782, 794 (Tex. App.—El Paso 2019, pet. denied)). For example, "[w]hen an employer points to an employee's poor performance as a reason for an

[17]Age Discrimination in Employment Act of 1967.

22

adverse employment decision, contradictory evidence that an employer is satisfied with an employee's work performance can serve as evidence of pretext." *Id.* (citing *Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 915 (Tex. App.—Fort Worth 2018, pet. denied)). On the other hand, "subjective beliefs and unsupported allegations discounting [an employer's] proffered reasons for its adverse employment action do not raise genuine issues of material fact regarding pretext." *Valles v. McLane Foodservice, Inc.*, No. 02-17-00134-CV, 2018 WL 547782, at *6 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.).

In a failure-to-hire case, the plaintiff also may—but is not required to[18]—raise a genuine issue of material fact on pretext "by showing that the plaintiff was clearly better qualified than the person selected for the position." *Univ. of Tex. Rio Grande Valley v. Kavanaugh*, No. 13-22-00351-CV, 2023 WL 2182300, at *4 (Tex. App.—Corpus Christi–Edinburg Feb. 23, 2023, no pet.) (mem. op.); *see Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 (5th Cir. 2007). "Evidence of relative qualifications must be specific and comparative rather than merely subjective and speculative." *Kavanaugh*, at *4 (citing *Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802, 825 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)).

---

[18] *See Sepulveda*, 2023 WL 2529747, at *6 (citing cases and noting that although plaintiff may raise fact issue on pretext by presenting evidence that she is clearly better qualified, she may present evidence of pretext in other ways).

## B. FAILURE-TO-HIRE CLAIM

UNTHSC contends that it did not hire Paul for the posted tenure-track position because she did not meet the required qualifications. Paul does not dispute that this is a legitimate, nondiscriminatory reason, *see Elgahil*, 45 S.W.3d at 140, but she claims that she presented evidence raising a fact issue on whether this reason is pretextual.

### 1. Paul's and Griner's Qualifications

Before UNTHSC hired Paul, she had worked as a nontenure-track instructor in the communications field and then was hired by the University of North Texas as a tenure-track assistant professor in the same field. She resigned from that position for personal reasons. Paul then shifted focus and worked for Texas Christian University as director of the Women's Resource Center and an instructor in women's studies; while there, she "started to develop courses in" MCH. Paul left TCU when her grant was not renewed, and she went to work doing development and fundraising for Samaritan House, a nonprofit organization working with people suffering from HIV and AIDS. Finally, Paul worked as Director of Racial Justice for YWCA of Fort Worth, coordinating programming.

Paul described how UNTHSC had hired her for a nontenure-track instructor position in 2011:

> The dean at the time . . . had heard about my work. I was the Chair of
> the Fort Worth Mayor's Commission for Women and we were doing
> work on infant mortality and he wanted to know who I was. And his

24

Director of Community Health . . . and I had worked together on a project; and she -- they asked me to come over and run -- they had a grant funded through UNT Health Science to start a coalition against -- to reduce infant mortality. So they asked me to join UNT Health Science to do that, to manage that project.

Although she was hired initially to be a project manager, she had missed teaching, so Thombs "agreed" to let her teach for the School "because [she] had all this community health, community-based research experience."[19]

While working as a nontenure-track instructor at UNTHSC, Paul completed her PhD, writing her dissertation on infant mortality, with a focus on the DFW area. UNTHSC then promoted her to nontenure-track assistant professor. Paul taught "all graduate classes," including "community health, . . . health disparities, [and] qualitative research methods." According to Paul, she was "considered an expert in [her] field," which was "infant mortality . . . from a cultural [and] sociological lens, [and which also included] doing qualitative research." As an assistant professor, Paul had published peer-reviewed research as a secondary author and had received two grants for presentations. She co-ran the Interprofessional Education Program for the college, which she had started, and it was successful. At the end of her employment, Paul (1) was on the Doctor of Public Health Graduate Committee, overseeing finishing doctoral students, (2) was an expert on the Federal HHS MCH panel, (3) was a member of the faculty senate, "getting ready to take over the presidency," (4) had

---

[19]Thombs, who was Department Chair at that time, initially hired her to teach one class per semester.

25

finished a Texas grant "providing peer preconception education to the nine historically black colleges and universities in Texas," and (5) had finished building grant coalitions.

According to Paul, Thombs knew "from the time [she] was an instructor" that she wanted a tenure-track position "to move into research,"[20] but whenever she tried to tell Thombs, he would say, "There's nothing available," or he did not answer her. Although not required for her position, she brought in grant money[21] and conducted research. Additionally, when she was promoted to nontenure-track assistant professor, she asked for startup funding and research money—which she said UNTHSC provided "when a new position [was] hired"—but Thombs told her, "It just doesn't happen." Yet she "knew otherwise because [she] had seen it happen," and she named an instructor who had received such startup funding.

---

[20]Paul explained that "[t]enure[-]track [positions are] research based," and have heightened research and service responsibilities, while nontenure-track positions require pedagogical research and have different expectations. Thombs averred that while "[t]enure[-]track faculty are expected to cover a portion of their salaries from external research grants they obtain[, t]he salaries of non-tenure track faculty are funded internally and not through external grant sources."

[21]According to Walters, Paul had applied "for a few small grants." But Paul testified that she had brought in over $800,000 in grant funds. In her 2017 evaluation, Paul wrote, "I have a TX-DSHS grant at 25% of my time. This grant employs one full-time staff, one part-time staff, and three MCH graduate students." Walters wrote in that same review that she "covered 10% of her time through extramural funding," but he noted that she might "want to consider increasing service to the scholarly teaching or practice profession."

In contrast, Paul presented evidence that Griner had not yet completed her PhD when UNTHSC hired her for the tenure-track position,[22] although she had earned it by May 2019. Griner's PhD was in public health from, according to Walters, a "research-intensive university [that] is widely regarded as one of the top schools of public health in the southern United States." When Griner applied for the position, she had been first author on five peer-reviewed publications. In her application letter, Griner noted that she focused "on maternal and child health and risk behaviors among adolescent and young adult populations." While earning her PhD, she "was awarded two . . . MCH . . . Bureau funded traineeships in MCH Leadership and MCH Epidemiology. Through th[at] interdisciplinary training, [she was] able to apply health behavior theory and utilize mixed-method techniques to study sexual health among young adults."

Walters thought that, "per the qualifications in the ad," Griner "was the better candidate in terms of scholarship." He explained that "[s]he had mentors that were . . . solid researchers, with a history of grant funding and scholarly work." Regarding her MCH experience, "[s]he had a graduate certificate in . . . women's and gender studies. So she had specific training in that area." Griner also had, according to Walters, "a track record of scholarly publications and some grants at that point, some small grants."

_____

[22]The record does not show Griner's exact hire date, but the posting closed on January 30, 2019.

27

However, Paul also presented evidence that, unlike her, Griner had no "practical" MCH experience other than as an HPV researcher. Paul did not think Griner was qualified for the position for which she was hired because "she didn't have the MCH experience[,] and they were looking to build an MCH program. She didn't have the community experience that I had in . . . MCH . . . . I have been steeped in the five zip codes of Fort Worth with infant mortality. I was considered an expert in the area." Paul also contrasted her eight-to-nine years' teaching experience in MCH with Griner's graduate-only teaching experience.

Thombs testified about why he approved the recommendation[23] to hire Griner:

Because of her research training, and she's been very successful here in research, has funded research, significant funded research. I think she has 40-some or 50-some publications since she joined us, so she's really done extremely well.

So what we were seeking was a tenure[-]track professor who could obtain external funding, and that's what this search was all about, and specifically in the area of [MCH].

Thombs did not think Paul's credentials were commensurate with Griner's:

Her doctoral degree is in women's studies, which is in the humanities. Marcy and I had several discussions about this. She wasn't -- she was never hired into the tenure track, meaning having research responsibilities, because she just didn't have that background or that training. She was not going to -- she couldn't compete for NIH funding, for example.

---

[23]According to UNTHSC's interrogatories, "[a] selection committee, chaired by . . . Walters, made a recommendation to . . . Thombs[,] who then hired" Griner.

According to Thombs, "[N]ot all PhDs are created equal."  Thus, that Paul had a humanities PhD and Griner had a public-health PhD was significant to him:  "Many PhDs, like in humanities, for example, you don't get training as in a health science center.  You don't get the training in research methods, statistical analysis.  It's just . . . not there.  Many – many doctoral programs today are not, especially in the humanities, are not research-based."

Likewise, Thombs did not think Paul's research-and-grant background was commensurate with Griner's.  According to Thombs, Paul "was not a researcher.  Her grants were not research grants.  They were programmatic grants."  He recalled that Paul had either never made a contribution to the scientific literature or if she had, it was "a very, very modest contribution."  Thombs described the purpose of the funding she obtained as "to provide community services, not to carry out research and then publish [it] in the scientific literature."  Of the "three buckets of faculty activity[—t]eaching, research, and service[—h]er funded work was in the area of . . . service."  According to Paul, though, "[h]istorically, up to this point,[24] more women do qualitative research"; therefore, she saw the favoring of quantitative research over qualitative research[25] as sexist.

_____

[24]According to the record, Griner, with a more quantitative-research background, is at least twenty years younger than Paul.

[25]"In qualitative research, data are collected in the form of descriptions from systematic observations, from which conclusions are drawn."  William Bernet, M.D. & Demosthenes Lorandos, *Qualitative research regarding parental alienation*, in 3 Litigator's

## 2. Analysis

According to UNTHSC, the evidence does not raise a fact issue as to whether Paul was clearly better qualified than Griner because the evidence shows that Paul did not have the quantitative research background or potential that the tenure-track position required and because her humanities PhD is not "closely related to public health" in that it did not require such a research and statistical-analysis background. But the job posting itself does not distinguish between quantitative and qualitative research, does not expressly require a "research-based degree," and does not mention that the successful candidate would be required to "compete for funded research from the National Institutes of Health." And we note that, although the posting itself sought "[r]ecognition or promise of outstanding contributions as a *scholar*," UNTHSC has, in its briefing, reframed this qualification to require "recognition or promise of outstanding contributions as a *researcher*." [Emphasis added.] UNTHSC cannot rely solely on its later-articulated subjective interpretation of the job's stated requirements to defeat Paul's claim of pretext. *See Stennett v. Tupelo Pub. Sch. Dist.*, 619 F. App'x 310, 322 (5th Cir. 2015); *cf. Flores*, 657 S.W.3d at 513–15 (holding that when credibility of "sole, unquestioned decision maker" was at issue and that person had articulated

Handbook of Forensic Med., Psychiatry and Psych. § 21:7 (Demosthenes Lorandos ed., 2023). Whereas, "[i]n quantitative research, data are collected in the form of numerical values and analyzed statistically, from which conclusions are drawn." *Id.* "Descriptive, qualitative research is used to explore newer subject areas that require the generation of hypotheses. After qualitative research is conducted, hypotheses can be tested through quantitative research. Both approaches are acceptable methods of conducting research, each with their respective advantages and disadvantages." *Id.*

30

legitimate, nondiscriminatory reason based on "subjective and previously unmentioned or peripheral hiring criteria," evidence was sufficient to raise a fact issue as to pretext (quoting *Stennett*, 619 F. App'x at 322)).

When Griner was hired, Paul had already earned her PhD; Griner had not, although her prospective PhD was specifically in public health. Paul had almost a decade of MCH-related teaching experience at UNTHSC, was an expert in infant mortality, and had qualitative-research experience beyond what she had been expected to do for her nontenure-track position. She had also received grant funding. Griner had MCH experience with a specific focus on adolescent sexual health (arguably a different specialized field within MCH) and quantitative-research experience, but she did not have the same teaching background.

Considering these facts as well as the facts that (1) the job posting itself lacked the emphasis on quantitative research that UNTHSC now places on it, (2) Walters had referred to Paul in an evaluation as abrasive after Thombs had—in a prior evaluation—described her conflict with a colleague as a "temper tantrum," (3) Thombs openly referred to Griner's youth during a meeting with other faculty present,[26] and (4) Paul's notice of nonrenewal was dated the day after the tenure-track job posting closed, we hold that Paul has brought forward sufficient evidence to raise a fact issue that UNTHSC's articulated legitimate, nondiscriminatory reason for not

---

[26]According to Paul, at the time, Thombs was "bringing in all young faculty." The majority hired for tenure-track positions were from Griner's university, where Thombs had worked prior to UNTHSC.

hiring her for the tenure-track position was unworthy of credence and was not the only reason she was not hired. *See, e.g., Goudeau*, 793 F.3d at 475–77 (concluding that ageist remarks raised fact issue on pretext when considered with other evidence casting doubt on employer's stated reason for termination); *City of Dallas v. Siaw-Afriyie*, No. 05-19-00244-CV, 2020 WL 5834335, at *8–10 (Tex. App.—Dallas Oct. 1, 2020, no pet.) (mem. op.) (applying mixed-motive analysis and determining evidence created fact issue on pretext); *Univ. of Tex. Sw. Med. Ctr.*, 2020 WL 5757393, at *11–13, *20–23 (same); *Gonzalez v. Champion Techs., Inc.*, 384 S.W.3d 462, 475–76 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (same); *see also Seay*, 339 F.3d at 465. Thus, the trial court has jurisdiction over Paul's age- and sex-discrimination claims related to UNTHSC's failure to hire her for the tenure-track position.

## C. Nonrenewal Claim

We next consider whether UNTHSC gave a sufficient legitimate, nondiscriminatory reason for terminating Paul's contract, sufficient to shift the burden back to her. Paul claims that UNTHSC did not, but we disagree.

### 1. UNTHSC's Articulated Reasons for Nonrenewal Sufficient

In its interrogatories, UNTHSC gave the following reason for not renewing Paul's contract: "The Department was headed in a different direction and the classes taught by Plaintiff no longer fit in the new curriculum." It also identified Thombs and Walters as the persons who decided not to renew Paul's contract.

32

But in his deposition and affidavit, Thombs stated that although he was the ultimate decisionmaker, he had also consulted with another dean, Emily Spence, as well as Walters, in making the decision. According to Thombs, "after weeks and months of talking [with Spence] about what else we could do, and reassigning [Paul's] workload, we decided that what we had to do was to provide her with a notice of . . . contract nonrenewal." He also answered, "Yes," when asked, "[D]id y'all have a meeting where y'all made a final decision, the three of y'all discussed and made a final decision as to whether or not to renew . . . Paul's appointment at the university?"

Thombs's affidavit provides more detail:

19. I decided not to renew Dr. Paul's contract primarily because of her unwillingness to cooperate in implementing a new practicum for the master's in public health ("MPH") internship program. In late 2017 or early 2018, the School . . . determined that it was going to make major changes to its MPH internship program. This change in direction was prompted by changes in the field. Previously, each faculty member involved with the internship program could tailor and individualize it in a way they wanted. The School . . . wanted to revamp the internship program and standardize it across the school. Dr. Spence, the Associate Dean for Community Engagement and Health Equity, oversaw the introduction of this revamped practicum.

20. Dr. Paul was part of a team of faculty members assigned to implement this new practicum. But Dr. Paul was very uncooperative and obstructed the implementation of the new practicum. Dr. Paul wanted to keep the internship program the way it had previously been carried out. Dr. Spence spent months trying to get Dr. Paul on board with the school's new approach in carrying out the practicum. Over time, it became evident that Dr. Paul was not cooperating with this approach. She continually resisted and obstructed the implementation of the new practicum.

33

21. After Dr. Spence and I had spoken for months about Dr. Paul's behavior and lack of cooperation, we began to discuss other potential assignments for Dr. Paul and the possibility of removing her from the MPH practicum altogether. However, a large part of Dr. Paul's role in the School . . . was participating in the practicum. After exploring other teaching responsibilities and alternative assignments, we realized that there was little else we could ask Dr. Paul to do in lieu of participating in the practicum. That was due in part to Dr. Paul's limited academic background with regard to being a faculty member in a school of public health. Ultimately, I determined that the only practical solution was to provide Dr. Paul with a notice of contract nonrenewal.

Although Thombs testified in his deposition that he did not recall the details of the discussion at the specific meeting at which he, Walters, and Spence decided not to renew Paul's contract, he did say, "In general, I remember the theme was that she was interfering with the new approach that we were adopting, we had adopted, and she was interfering with its proper implementation."

Walters recalled that UNTHSC did not renew Paul's contract because (1) "students found her to be disorganized and difficult to follow in a classroom setting[, as] borne out on her classroom evaluations"; (2) "she was often tardy in submitting work"; (3) her work was of "poor quality"; and (4) she had trouble taking feedback—making excuses or saying it was not important.

Paul argues that this evidence is insufficient to show a legitimate, nondiscriminatory reason for the contract nonrenewal, citing *Turner v. Kansas City Southern Railway*, 675 F.3d 887, 904 (5th Cir. 2012), for the proposition that "[t]he Fifth Circuit has held that the employer[']s failure to clearly identify who made the termination decision results in its failure to carry its burden to produce a legitimate,

34

non-discriminatory reason that motivated the employment decisions at issue." *Turner* does not govern here, however.

In *Turner*, the employer disciplined four employees; during the EEOC's investigation and during several years of discovery, the employer identified employees who investigated the disciplinary actions as the decisionmakers regarding the discipline. *Id.* at 889–90. But when those employees were deposed, they denied making the disciplinary decisions. *Id.* at 890. Eventually, the employer identified a "likely" decisionmaker, but that person "could no longer remember any of the[] specific decisions." *Id.* No evidence mentioned or gave any reason for the ultimate decisionmaker's disciplinary actions. *Id.* at 904. Thus, there was no record evidence of the reason for the employment decisions "at the time [they were] made." *Id.* (citing *Burdine*, 450 U.S. at 254–55, 101 S. Ct. at 1094–95; *Patrick*, 394 F.3d at 319 ("As the ultimate issue is the employer's reasoning *at the moment* the questioned employment decision is made, a justification that *could not* have motivated the employer's decision is not evidence that tends to illuminate this ultimate issue and is therefore simply irrelevant at this stage of the inquiry.")).

The facts here are not comparable to those in *Turner*; therefore, *Turner*'s analysis does not apply. This is not a case in which the ultimate decisionmaker was unknown and therefore for which evidence of the reason for the decision at the time it was made could not be offered. Whatever Spence might have contributed to the discussion, the evidence shows that Thombs was the ultimate decisionmaker, and he

articulated a reason for the nonrenewal at the time the decision was made. Thombs's reason for the contract nonrenewal is sufficiently clear to demonstrate the participants' collective reasoning informing the ultimate decisionmaker's choice, and it is specific enough[27] to allow Paul to counter it with evidence of pretext. *See Burdine*, 450 U.S. at 254–56, 101 S. Ct. at 1094–95. Thus, we conclude that UNTHSC provided sufficient evidence under *McDonnell Douglas* to shift the burden back to Paul.

## 2. Pretext Evidence Is Sufficient

Finally, we consider whether Paul presented evidence that would raise a fact issue as to whether UNTHSC's given reasons for her contract renewal are mere pretext.

### a. Relationship with Thombs

Paul testified that she and Thombs had a "great social relationship at school" while he was Department Chair. For the first several years, her work experience was "great," and Thombs was her "go-to person." But Thombs had also written in a performance review that Paul had "temper tantrums" after she got angry with a colleague who had unprofessionally yelled at her assistant and then confronted the woman about it in Thombs's office. Paul thought the use of the phrase "temper

---

[27]"To satisfy its burden, '[t]he employer need only articulate a lawful reason, regardless of what its persuasiveness may or may not be'; the credibility of the reason comes into play later, in assessing pretext." *City of Haltom City v. Forrest*, No. 02-20-00084-CV, 2021 WL 733057, at *7 (Tex. App.—Fort Worth Feb. 25, 2021, no pet.) (mem. op.) (quoting *Joseph v. City of Dallas*, 277 F. App'x 436, 439–40 (5th Cir. 2008)).

tantrum" was sexist and remembered that Thombs himself had engaged in "screaming matches" with at least one male colleague.

Paul also testified that after Thombs became Dean of the School in 2017, the atmosphere "became very toxic," and "[a] lot of people left." According to Paul, one of the issues she had with Thombs as Dean involved his wanting the professors "to be much more diligent with . . . grading and not give out so many A's." Paul had to send her grades to both Thombs and Walters every semester; once, Thombs called her grades inflated "and [said] that there would be repercussions if [she] didn't change that."[28] Paul testified that Thombs stopped communicating with her when she challenged him about the grades email.

Also, Paul perceived that Thombs became angry that she had spoken to a University of Texas at Arlington class taught by a colleague. She further described an incident resulting in Thombs's sending students an email criticizing a campus sexual-health information campaign she had helped coordinate. Although the incident appeared to involve a misunderstanding, Paul saw it as evidence of Thombs's negative conduct toward her: "And it turned out he didn't understand it; but this quick response of an e-mail to the students, without having conversations with me, and then turning around and saying it was great, happened on a couple of occasions with different issues."

---

[28]According to Paul, Thombs "always had this caveat in his e-mails . . . : There will be repercussions." Some of them said, "You will resign from your position," which Paul took to mean that she would not get a new contract.

Paul explained why she thought Thombs had a problem with her age:

[I]n 2017 Dr. Candace Robledo, who was hired to be the [MCH] Director[,] . . . left . . . because she felt she had no support . . . . And I wrote a letter . . . to . . . Thombs and . . . Walters regarding taking over the [MCH] program; and in the e-mail, I had discussed everything that I had already contributed to the [MCH] program, even in terms of building that program. And I was ignored. And then it was offered to me because they couldn't find anybody, but they were not going to compensate me for that.

So that started my estimation that he didn't want me around anymore. He wanted young people, even though I was the one that really helped start the MCH program, and that continued to the next position that was posted for an MCH position.

### b. Relationship with Walters

Paul testified that in her 2018 annual review, she wrote that she is "direct" but that Walters responded that she is "abrasive"; she had already shared with him, "[T]hat that kind of terminology is sexist." Walters had also told Paul that her research "wasn't real research." She considered this a subtle sexist message because "more women do qualitative research." Walters also planned a lunch event at the same time she was planning a similar event with a multicultural group of women; when she asked him why he would conflict with her event, he said, "Well, it's not research."

### c. Performance reviews

In 2016, when she was promoted to assistant professor, Paul's performance evaluation read, "Using the criteria of Article IX of the UNTHSC Faculty Bylaws, the

38

Committee concluded that Dr. Paul <u>meets the criteria</u> for promotion to Assistant Professor."

In 2017, Walters rated Paul as "Meets Expectations" for Interpersonal and Communication Skills and Professionalism and "Exceeds Expectations" for Ongoing Learning and Self-Improvement and Supporting Strategic Decisions. He noted that she had an "[a]dequate level of professionalism." Regarding course evaluations, he wrote, "Course delivery is good. Course evaluations are in the adequate to excellent range." Her overall rating was "Meets Expectations." One of his comments was that, "[i]n order to be on track for promotion, Dr. Paul should focus on generating teaching scholarship over the next 2–3 years."

In Paul's 2018 review, Walters indicated, "Exceeds Expectations," in two categories—Ongoing Learning and Self-Improvement and Supporting Strategic Direction. In the second category, he commented, "Dr. Paul is *aligned with the mission of* the department and School. She is an asset to our MCH program." [Emphasis added.] Later in the evaluation, he wrote, "Dr. Paul was instrumental in the development of new MCH courses. . . . Peer reviews were good. Student ratings of courses were in the moderate to good range. Some student comments suggested that courses could be organized [sic]."

For Interpersonal and Communication Skills, though, Walters marked "Meets Expectations." In response to Paul's comment, "[I]f I don't trust [someone], I will sometimes have an interpersonal break of good communication," he wrote, "I agree

39

that her style can come off as abrasive at times."[29]  When later questioned about what he meant, Walters said he was agreeing with Paul.  He thought "interpersonal break" and "abrasive" are synonyms.  But Paul appealed her evaluation and wrote on her review,[30]

> Using the term "abrasive" is [sic] a word, as evidence-based research illuminates, is highly gendered and sexist and considered a term men use toward women, who are direct and confident, in the workplace.  In addition, I did not, anywhere in my review say that I was "abrasive[,]" so I am not sure who is being agreed with in the response, "I agree that her style can come off as abrasive at times."

Walters's overall assessment was that Paul met expectations,[31] noting, "Overall, Dr. Paul meets or exceeds most of our metrics."

In considering Paul's appeal, Thombs wrote,

> Though she does not indicate this directly, it seems Dr. Paul's requests are to have the Department Chair change her evaluation in the areas of "Professionalism" and "Service."  I carefully reviewed Dr. Walters' comments in these two areas and find them to be reasonable.

> Dr. Paul is a valued and respected member of the SPH faculty.  I admire her outspoken style and reflective critiques.  Some of her comments seem to indicate that she believes she is not a respected or

---

[29]The evidence also showed that a student had written in Paul's spring 2016 evaluations that some of Paul's comments were "abrasive and offensive at times."

[30]Thombs testified that he agreed with Paul's "cultural analysis" but that he "would be engaging in interpretation to say whether that applies to this specific situation."  He agreed that he had called male professors abrasive before.

[31]Walters rated Paul's Professionalism as "Not Meeting Expectations."  In response to her admission, "I sometimes do not meet deadlines," he wrote, "I agree with her self-assessment.  She often requires prompting, and tends to be one of the last ones to complete assignments.  This is an area for improvement."

valued . . . SPH faculty member. This is not the case at all. I encourage her to speak with me more about this, if she wishes.

After reading Dr. Paul's evaluation, I need to emphasize again that her faculty responsibilities do not include research, i.e., the scholarship of discovery. She is expected to engage in the scholarships of integration, application and teaching, which can be documented by peer-reviewed publications, books, and book chapters and other means.

Thombs's Final Adjudicator Rating was "meets expectations." He signed the appeal on September 27, 2018.

Thombs admitted that this review did not mention "the work that [Paul] was assigned to do in the practicum and the . . . serious conflict that she had with Dr. Spence."

### d. Analysis

Similarly to the failure-to-hire claim, the evidence on this claim is a mixed bag and therefore sufficient to raise a fact issue on pretext.

Evidence that an employer is "pleased with an employee's work performance supports a finding of pretext when that evidence contradicts the reason given by the employer of poor performance." *Bell Helicopter Textron, Inc.*, 552 S.W.3d at 915–16 (quoting *Dell, Inc. v. Wise*, 424 S.W.3d 100, 112 (Tex. App.—Eastland 2013, no pet.)). Additionally, doubt about the true reason for the decision can be established by showing an employer's shifting or different reasons, *De la Cruz*, 2023 WL 2422501, at *6 (citing *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017)), or delay in taking action for misconduct, *City of Richland Hills*, 2021 WL 4205013, at *7.

UNTHSC gave as its initial reason, "The Department was headed in a different direction and the classes taught by Plaintiff no longer fit in the new curriculum."[32] But in later depositions and affidavit evidence, the reason became that Paul actively obstructed implementation of the new curriculum. Obstruction of the new practicum was never mentioned in Paul's performance reviews, which—although not perfect—showed that she met UNTHSC's expectations overall and even exceeded them in some areas. Paul's obstruction allegedly occurred around the same time as (1) Paul's appeal of her 2018 performance evaluation—specifically complaining about the "abrasive" comment, (2) her application for both the tenure-track position (which she had sought since first hired as an instructor) and Department Chair position, and (3) Thombs's comment about Griner's being "young[,] with new ideas." Taken together, all of these facts combine to create a fact issue as to whether UNTHSC's stated nondiscriminatory reason given in its plea-to-the-jurisdiction evidence was merely pretextual. *See Dall. Cnty. Hosp. Dist. v. Kowalski*, No. 05-21-00379-CV, 2023 WL 2782312, at *8–10 (Tex. App.—Dallas Apr. 5, 2023, no pet. h.) (mem. op.); *Flores*, 657 S.W.3d at 514–15; *San Benito Consol. ISD v. Cruz*, No. 13-20-00310-CV, 2021 WL 921793, at *9–10 (Tex. App.—Corpus Christi–Edinburg Mar. 11, 2021, no pet.) (mem. op.); *cf. Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 354 (5th Cir. 2014) ("[P]roximal timing must be coupled with other evidence, which must be

---

[32]Walters, although not the ultimate decisionmaker, cited Paul's allegedly poor performance as the reason.

substantial where . . . the employer has provided significant evidence of a legitimate reason for the termination.").

Because we hold that Paul raised a fact issue on pretext as to both her contract-nonrenewal and failure-to-hire claims, we overrule UNTHSC's third issue.

## VIII. CONCLUSION

Having sustained UNTHSC's second issue in part and having considered Paul's concession on appeal, we reverse the trial court's denial of UNTHSC's plea to the jurisdiction on Paul's sex-discrimination claim related to UNTHSC's nonrenewal of her contract and on her retaliation claim—and age- and sex-discrimination claims—related to UNTHSC's failure to hire her for the Department Chair position. But having overruled UNTHSC's other issues and the remaining part of its second issue, we affirm the trial court's denial of UNTHSC's plea to the jurisdiction as to the other five claims alleged in Paul's first amended petition: (1 & 2) retaliation and age discrimination for the contract nonrenewal and (3–5) retaliation, age discrimination, and sex discrimination for the failure to hire her for the tenure-track position.

/s/ Brian Walker

Brian Walker
Justice

Delivered: July 27, 2023